Jeff L. LOVE a/k/a J.L. Love and
Daniel L. Welch, Appellants,

v.

STATE of Texas, Appellee.

No. 03–97–00506–CV.

Court of Appeals of Texas,
Austin.

June 18, 1998.

Timothy N. Smith, Houston, for Appellant.

Dan Morales, Atty. Gen., Priscilla Hube-nak, Asst. Atty. Gen., Austin, for Appellee.

Before POWERS, KIDD and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

The State of Texas brought an action in district court to enforce a final order issued by the Railroad Commission assessing administrative penalties against Sopresa Petroleum, Inc. for failure to plug inactive wells in violation of the Texas Natural Resources Code. Additionally, the State sued to recover civil penalties, plugging costs, and attorney's fees. The State also sought to hold Jeff Love (a/k/a J.L. Love) and Daniel Welch individually liable for Sopresa's debts under alternative theories of liability including "piercing the corporate veil." The district court rendered judgment on the jury verdict in favor of the State. We will affirm the district-court judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

At all relevant times, Sopresa was the registered operator of two oil and gas leases—the Klein lease and the VIM lease. The company was incorporated in 1981 by Welch; its directors and shareholders were Welch, Love, and Alan Murphy. Shortly after incor-poration, Murphy resigned from the board and sold his shares to Love and Welch who remained the sole shareholders and directors until Sopresa was allegedly sold in December 1986. Love was the company president, Welch was the secretary and treasurer, and Pat Welch, Dan Welch's father, was the vice-president. Operators of oil and gas wells are required to maintain current addresses with the Commission on a P–5 form. 16 Tex. Admin. Code § 3.1(a) (1997). The record reveals that Sopresa filed the required P–5 form with the Commission in 1984, 1985, and 1986. All three years the address of the company *and* officers (Love and both Welch-es) is listed as: P.O. Box 2086, Temple, Tex-as. Neither Sopresa nor any officer has ever filed an amended P–5 form indicating a change in its officers or address.

There is no dispute that Sopresa Petrole-um, the operator of the Klein and VIM leas-es, had failed to properly plug abandoned oil wells and was therefore liable under the Tex-as Natural Resource Code. *See* Tex. Nat. Res.Code Ann. title 3, subtitle B, ch. 89 (West 1993 & Supp.1998). Although it is not clear, the evidence reveals that both or at least one well may have been inactive since 1982. Undoubtedly, some violations were ap-parent as early as 1984: a letter from the Commission dated January 27, 1984 and ad-dressed to Sopresa and Love at P.O. Box 2086 states that the Klein well was in viola-tion of certain Commission rules. The rec-ord is blank until March 28, 1986, when the Commission again inspected the Klein lease and found that it was abandoned and "inac-tive for a long period of time." On April 1, the Commission sent notice to Sopresa and its officers informing them of the violation. Subsequent inspections in May and June re-vealed the Klein lease remained in noncom-pliance; on October 15, the Commission sent Sopresa a letter indicating the matter would be referred to the agency's legal department.

Regarding the VIM lease, the record ap-pears incomplete. On October 13, 1986, the Commission sent a similar notification letter to Sopresa and its officers indicating the lease was in violation of rules and statutes. Inspections on November 13 and December 12 revealed the same. The violations listed

for the VIM lease were similar to the Klein lease: abandoned oil well, oil spills, and pollution. All notices and letters regarding the VIM lease and the Klein lease were sent to P.O. Box 2086 in Temple, the address listed on the most recent P–5 form filed in December 1986.

On December 11, 1986, Sopresa sold a different lease, the Ogden lease, to a company called Calidad Petroleum. Calidad is wholly owned and operated by Love and Welch. Expert testimony revealed at trial that the Ogden well was producing oil and gas in marketable quantities. Just three days after transferring the Ogden lease from Sopresa to Calidad, Love and Welch allegedly sold Sopresa to Luis Ybarra, a Mexican national. The contract reveals that Ybarra paid $1000 for the company, the main assets of which were the Klein and the VIM leases. Love testified that in addition to the two leases, Ybarra received equipment left at the site to cover the cost of plugging the wells, in the event Ybarra was unable to obtain a permit to use the leases as salt-water injection or disposal wells. However, photos of the two wells taken in June and December 1986 fail to reveal the purported site equipment.

Only a few months after the sale, the Commission received a letter from Love indicating that he and Welch were no longer shareholders, officers, or directors, that Pat Welch had resigned as well, and that the new owner was Luis Ybarra.[1] The letter listed an Arizona address for Ybarra. The next event did not occur until March 16, 1988, when the Commission sent Sopresa a formal notice of a hearing regarding the violations on the VIM lease. Days later, Love filed with the secretary of state his resignation as the registered agent of Sopresa. The Commission sent Sopresa a formal notice of a hearing regarding the Klein lease in August 1992.

The Commission's final orders assessing administrative penalties against Sopresa for violations on the VIM and Klein leases were not issued until August 1988 and June 1993, respectively. The wells were eventually plugged by the State in October 1991

and March 1993. In 1996 the State sued Sopresa, and Love and Welch individually, for administrative penalties, civil penalties, reimbursement for plugging expenses, and attorney's fees. The petition alleged appellants were liable as officers and directors for the debts of Sopresa because it failed to file a franchise tax report. *See* Tex. Tax Code Ann. § 171.255 (West 1992). The State also alleged as alternative theories of liability that Love and Welch were the alter-egos of Sopresa and that they had used the corporation as a sham to perpetrate a fraud. The jury found that both Love and Welch had used the corporation as a sham to perpetrate a fraud on the Commission. The district court entered judgment on the verdict in favor of the State, ordering Love and Welch to pay administrative penalties, civil penalties, expenses for plugging, and attorney's fees. Love and Welch now appeal, complaining that: (1) the jury's findings were in fatal conflict; (2) the trial court erred in submitting a jury issue on "alter-ego" and "sham to perpetrate a fraud" because there was no evidence that appellants were shareholders of Sopresa or that they committed actual fraud; (3) the trial court erred by not granting a directed verdict to appellants after the State's case in chief; and (4) there was insufficient evidence that Love was the alter-ego of Sopresa and that appellants used the corporation as a sham to perpetrate a fraud.

## DISCUSSION

### Fatal Conflict

The State sought to hold Love and Welch liable for all of Sopresa's liabilities under three alternative theories: (1) failure to file franchise tax report; (2) alter-ego; and (3) sham to perpetrate a fraud. The jury failed to find that Love and Welch were shareholders, officers, and directors of Sopresa on the dates the final orders were issued or the wells plugged; therefore, Love and Welch could not be liable under the Tax Code. *See* Tex. Tax Code Ann. § 171.255. The jury, however, did find that Love had been the alter-ego of Sopresa and that both Love and

---

1. The sales agreement stated that Pat Welch would remain an officer of Sopresa after the sale.

Welch had used the company as a sham to perpetrate a fraud.

█ Appellants claim the jury's failure to find that appellants were shareholders, officers, and directors on the specific dates of the final orders and the well-pluggings fatally conflicts with the jury's affirmative finding that appellants used Sopresa as a sham to perpetrate a fraud and that Love was its alter-ego. In reviewing jury findings for conflict, the threshold question is whether the findings are about the same material fact. *Bender v. Southern Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex.1980). A court may not strike down jury answers on the ground of conflict if there is any reasonable basis upon which they can be reconciled. *Id.* We hold the jury's finding that appellants used Sopresa as a sham to perpetrate a fraud does not conflict with the jury's failure to find appellants were shareholders, officers, or directors on certain dates.[2]

█ A "sham to perpetrate a fraud" is a theory of liability distinct from liability under the Tax Code. A party is free to plead alternative claims for relief. Tex.R. Civ. P. 48. Furthermore, appellants cite no case to support their theory that an individual must be a shareholder, officer, or director in order for that individual to be liable under the *sham* theory. Indeed we find several cases in which an individual has been held liable under the sham theory long after the corporation in which the individual had some prior interest is dissolved, bankrupt, or sold. *See, e.g., Huff v. Harrell*, 941 S.W.2d 230, 234 (Tex.App.—Corpus Christi 1996, writ denied); *Seaside Indus., Inc. v. Cooper*, 766 S.W.2d 566, 569–70 (Tex.App.—Dallas 1989, no writ). Thus, shareholder status of the individual at the time liability is assessed or at the time the Commission's orders became

final is not a prerequisite to liability under the sham to perpetrate a fraud theory.[3] The two findings of which appellants complain are not about the same material fact and are easily reconciled. We overrule appellants' first issue.

### Shareholder Status & Actual Fraud

█ Appellants complain that the trial court erred in submitting a jury issue on sham to perpetrate a fraud because there was no evidence that Love and Welch were shareholders or that they committed actual fraud.[4] As we have noted, Texas law does not require an individual to be a shareholder at the time liability is assessed if there has been a sham to perpetrate a fraud. *See, e.g., Huff*, 941 S.W.2d 230; *Seaside Indus., Inc.*, 766 S.W.2d 566. As is often the case, the corporation will have been dissolved, declared bankrupt, or sold by the time the case is tried and liability assessed against the individual. *Id.* In this case, there is no dispute that Love and Welch were shareholders, officers, and directors at least until December 14, 1986. They cannot escape liability merely because they were no longer in those positions when the wells were plugged or the final orders entered. We overrule issue four.

█ Appellants additionally claim the State was required to obtain a finding that they committed actual fraud in order to support its sham theory as required by article 2.21 of the Texas Business Corporation Act. *See* Tex. Bus. Corp. Act Ann. art. 2.21 (West 1980 & Supp.1998) The Act states:

A holder of share, an owner of any beneficial interest in shares, ... or any affiliate thereof or of the corporation shall be under no obligation to the corporation or to its obligees with respect to:

2. We need not decide whether the failure to find conflicts with the jury's finding that Love was the alter-ego of Sopresa because the jury found that appellants had used Sopresa as a sham to perpetrate a fraud, which is a separate basis upon which to uphold the judgment.

3. *But see Stewart & Stevenson v. Serv–Tech, Inc.*, 879 S.W.2d 89, 108 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (if basis for disregarding corporate fiction is *alter ego* it is necessary that there be some financial interest, ownership, or

control by individual sought to be held liable for tort of corporation).

4. Again, because the judgment may be upheld on the jury's affirmative finding to the sham issue, we need not address whether the court erred in submitting the alter-ego issue to the jury or whether there was insufficient evidence to support that finding. *See Speed v. Eluma Int'l., Inc.*, 757 S.W.2d 794, 796 (Tex.App.—Dallas 1988, writ denied).

*any contractual obligation* of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder ... did perpetrate an actual fraud on the obligee....

*Id.* (emphasis added). The Act itself makes clear that actual fraud is required only in the context of contractual obligations. Comments to article 2.21 confirm this by stating that in response to *Castleberry v. Branscum,* which concluded that constructive fraud was a sufficient basis to pierce the corporate veil, article 2.21 of the Act was amended in 1989 to establish a clear legislative standard under which the liability of a shareholder is to be determined for contractual obligations. Comments of the Bar Committee–1996, art. 2.21 (West Supp.1998) (citing *Castleberry,* 721 S.W.2d 270, 272–73 (Tex.1986)). Finally, the court in *Crum & Forster, Inc. v. Monsanto Co.* specifically held that the 1989 amendment to the Act does not preclude liability based upon something other than a contractual obligation. 887 S.W.2d 103, 146 (Tex.App.—Texarkana 1994, no writ); *see also Sims v. Western Waste Indus.,* 918 S.W.2d 682, 684 (Tex.App.—Beaumont 1996, writ denied) (*Castleberry* overruled to extent constructive fraud is no longer sufficient basis for contractual obligations). Here, the State seeks recovery for violations of rules relating to the prevention and control of pollution and for reimbursement of plugging expenses. This Court has recognized that debts arising from circumstances such as these are fundamentally different from contractual obligations. *Serna v. State,* 877 S.W.2d 516, 519 (Tex.App.—Austin 1994, writ denied) (when operator failed to comply with Commission safety rules and was assessed administrative and civil penalties, debts incurred were caused by failure to take actions statutorily required and administratively ordered). We hold that Sopresa's liabilities for administrative and civil penalties, plugging costs, and attorney's fees are not obligations of a contractual nature; therefore, a finding of actual fraud was not required in order to support a finding that appellants used the corporation as a sham to perpetrate a fraud. We overrule issue five.

### Insufficiency of the Evidence

■ Appellants make a general challenge to the jury-charge submission on the issue of sham to perpetrate a fraud on the grounds of no evidence. Appellants essentially restate their challenge to this same issue by also complaining that the trial court denied their motion for directed verdict and that the evidence was legally insufficient to support the jury's finding. An appeal from the denial of a motion for directed verdict and a challenge to the submission of an issue are the same as a challenge to the legal sufficiency of the evidence to support the jury's affirmative finding. *See Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992); *Kershner v. State Bar of Tex.,* 879 S.W.2d 343, 346 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (appeal from denial of motion for directed verdict is challenge to legal sufficiency of evidence). In reviewing a "no evidence" point, either in the context of evidence in support of a jury finding or proper submission of a jury question, we consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990). If there is more than a scintilla of probative evidence to support the finding, a no evidence challenge fails. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987); *Mai v. Mai,* 853 S.W.2d 615, 618 (Tex.App.—Houston [1st Dist.] 1993, no writ).

Appellants also challenge the factual sufficiency of the evidence to support the finding that Love and Welch used Sopresa as a sham to perpetrate a fraud. When reviewing a jury verdict to determine the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661

(1951); *see also Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515 (1991). In these circumstances, were we to find the evidence is factually sufficient to support the finding a no-evidence review would be unnecessary.

■ The Texas Supreme Court has held that the corporate fiction will be disregarded "when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Castleberry,* 721 S.W.2d at 271; *see Matthews Const. Co., Inc. v. Rosen,* 796 S.W.2d 692, 693 (Tex.1990) ("when the corporate form is used as an essentially unfair device—when it is used as a sham—courts may act in equity and disregard the usual rules . . . ."). The corporate fiction will be disregarded to prevent the use of the corporate entity as a cloak for fraud or illegality or to work an injustice. *Sims,* 918 S.W.2d at 684 (quoting *Castleberry,* 721 S.W.2d at 273). The courts of appeals have similarly recognized the corporate form is to be disregarded when the corporation is used to avoid a legal obligation, is used against public policy, or is used to perpetrate a fraud. *See id.* (citing *Valley Mechanical Contractors, Inc. v. Gonzales,* 894 S.W.2d 832, 834 (Tex.App.—Corpus Christi 1995, no writ); *Crum & Forster, Inc.,* 887 S.W.2d at 147–48; *Eastwood Model Market v. State,* 359 S.W.2d 294, 296 (Tex.Civ.App.—Austin 1962), *aff'd,* 365 S.W.2d 781 (Tex.1963)).

■ In *Castleberry* the supreme court held:

> To determine if there is an abuse of the corporate privilege, courts must look through the form of complex transaction to the substance. The variety of shams is infinite, but many fit this case's pattern: a closely held corporation owes unwanted obligations; it siphons off corporate revenues, sells off much of the corporate assets, or does other acts to hinder the ongoing business and its ability to pay off its debts; a new business then starts up that is basically a continuation of the old business with many of the same shareholders, officers and directors.

*Castleberry,* 721 S.W.2d at 275. The evidence of the case before us fits this framework. The State presented evidence that both the VIM and Klein leases may have been inactive as early as 1982. At the very least, the Commission recorded serious pollution violations in early 1986; in April and November the agency sent notice to Sopresa informing it of certain violations. The record reveals that the two notices, as well as a letter referring the matter to the legal department, were sent to the address listed on the 1985 and 1986 P–5 forms. Both P–5 forms listed the Temple post office box address for Sopresa, *and* Love and Welch; this form has never been amended. Most notable is the evidence that Love and Welch, on behalf of Sopresa, transferred to their other company, Calidad, Sopresa's most valuable asset, the Ogden lease, shortly *after* the Commission sent notice of the violations and just days before they allegedly sold Sopresa to Ybarra. Appellants contend they had no knowledge of the violations until 1988; they also claim that not until 1992 were they aware of the Commission's action to plug the wells. However, Love sent a letter to the Commission only four months after the sale in 1986, acknowledging the Commission's notices and informing the Commission of the change in ownership. Furthermore, Love stated that Pat Welch had also resigned from office; however, Dan Welch testified that Pat Welch had been the motivating force in the whole deal; Pat Welch had the ideas, had the oil and gas knowledge, and would run the operation because Ybarra was merely an investor.

Appellants also testified that the two leases were sold together for $1000 and on-site equipment; however, photographs taken in June and December 1986 reveal none of the purported equipment on either lease. Welch testified the company was sold for cash but could not recall where the money went. Neither Love nor Welch could produce documents they referred to as attesting to their resignation from Sopresa after it was sold. The jury could have reasonably concluded that appellants were not credible witnesses and that both Love and Welch were well aware of the violations on the leases before they transferred the valuable Ogden lease to

their other closely-held corporation and then allegedly sold the stripped Sopresa corporation to Ybarra.

The record reveals evidence that the Commission was never able to locate Ybarra at the Arizona address supplied by Love. In an attempt to refute the Commission's implication that Luis Ybarra never existed, appellants produced a receipt from the secretary of state for a corporate form paid for by Luis Ybarra. The receipt shows that in January 1988 Ybarra requested that a "resignation of registered agent" form be sent to Love. Love did not officially resign as Sopresa's registered agent until March 1988. Although the record contains some conflicting testimony, a jury is free to believe or disbelieve all or any part of the evidence in making its findings. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986).

Appellants contend that they cannot be held liable for debts of a corporation that were created after their sale of and resignation from the corporation. However, the legal obligations underlying these debts arose prior to the purported sale and appellants' purported resignations. The Commission had notified appellants that their wells were in violation of the law. The jury could have reasonably concluded that any sale of the corporation was part of a sham to perpetrate a fraud upon the Commission by selling a company with thousands of dollars of potential liabilities in penalties and very few assets. On the other hand, the jury may have believed appellants' testimony that they were not aware of the violations until 1988 because they had not been out to the oil-well sites for several years. This irresponsibility and neglect of a potential environmental hazard may have led the jury to find Love and Welch ignored their statutory obligations *because* they thought they could hide behind the corporate veil. Either way, there is sufficient evidence for the jury to have concluded that Love and Welch manipulated Sopresa's corporate form to escape their statutory obligations, and that this was against public policy, making it necessary to pierce its corporate shell to prevent an injustice.

There are several Texas cases with similar circumstances; courts have consistently pierced the corporate veil when the pattern of the sham is such that shareholders of a corporation with unwanted obligations siphon off revenues and sell assets, or do other acts to hinder the company's ability to pay its debts, such as start up a new business with the same shareholders. *E.g., Castleberry*, 721 S.W.2d at 274–75; *Klein v. Sporting Goods, Inc.*, 772 S.W.2d 173, 176–77 (Tex. App.—Houston [14th Dist.] 1989, writ denied) (sole shareholder liable for company debts when he incorporated new business to continue business of foreclosed company; foreclosure sale was merely attempt to avoid creditors); *Donovan v. Rankin*, 768 S.W.2d 443, 444 (Tex.App.—Houston [1st Dist.] 1989, writ denied) (wife and husband shareholders liable for attempting to dissolve corporation only to start up same business in new name to avoid judgment); *Seaside Indus.*, 766 S.W.2d at 568–69 (sole shareholder of company subject to unfavorable judgment dissolved company to incorporate new company; in addition to same owner and president, new company had same location, personnel, and telephone number as defunct business); *Speed v. Eluma Int'l, Inc.*, 757 S.W.2d 794, 797–98 (Tex.App.—Dallas 1988, writ denied) (individuals liable when shareholder and former shareholder set up scam involving a foreclosure-sale transaction in which the shareholder sold the bankrupt company's assets to the former shareholder's viable company in foreclosure action).

Because the evidence is both legally and factually sufficient to support the jury verdict, we overrule appellants' claims two, three, seven, and nine. As the verdict can be sustained on the finding that appellants used the corporation as a sham to perpetrate fraud on the Commission, we do not reach claims six and eight.

## CONCLUSION

We hold the jury's findings were not in fatal conflict, that the district court did not err in submitting the sham theory to the jury because shareholder status on certain dates and actual fraud is not required, and that the evidence was legally and factually sufficient

to support the jury verdict. Therefore, we affirm the judgment of the district court.