# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00578-CV

**Susie Nelms Gass, Appellant**

**v.**

**Luke Leon Coffee, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 1 OF HAYS COUNTY
### NO. 6123-C, HONORABLE HOWARD S. WARNER II, JUDGE PRESIDING

This case involves a dispute between appellant Susie Nelms Gass and appellee Luke Leon Coffee regarding the ownership of a horse named Durango. Gass, the original owner of Durango, claims she allowed Coffee to temporarily borrow the horse. When Coffee refused to return Durango, Gass sued him for recovery of the horse or, in the alternative, for damages for conversion. Coffee counterclaimed, alleging breach of contract by Gass or, in the alternative, a declaratory judgment naming Coffee the rightful owner of Durango. Following a jury trial, the trial court rendered judgment that Gass take nothing on her claims against Coffee, that Coffee take nothing on his claim for breach of contract, and declaring Coffee the rightful owner of Durango. As a result, the court ordered Gass to turn over any papers necessary to reflect Coffee's ownership of the horse. Because we find the evidence legally and factually sufficient to support an enforceable agreement between Gass and Coffee to exchange horses, we affirm the trial court's judgment.

**BACKGROUND**

Derek Gass, Ms. Gass's teenage son, participates in rodeo events, principally calf-roping, and often rode Durango during these events. Coffee is a professional rodeo clown who also participates in rodeo events, primarily bull-dogging, with his horse, Ima Pasture Affair. Derek and Coffee met during a rodeo event several years prior to this conflict and became friends.

On March 30, 1999, at a roping event in San Marcos, Coffee and Derek discussed trading their horses. Coffee approached Gass and asked her if she would agree to the trade. Gass responded that if it was all right with her son, it was all right with her. Two days later, Coffee called Derek, and the two agreed to meet to exchange horses. Coffee handed Derek some papers, which Derek later discovered were transfer papers for Ima Pasture Affair. Gass was not present during the exchange of the horses.

According to Gass and Derek, later that night, when Gass discovered that Coffee had given Derek transfer papers for Ima Pasture Affair, Gass attempted to call Coffee to clarify that the exchange was only temporary, but she was unable to reach him. She did not leave a message and made no further attempts to contact Coffee. Although Derek ran into Coffee a couple of weeks later at a roping event, he did not attempt to clarify the nature of the exchange with Coffee nor assert his continued ownership in Durango.

Several weeks later, at a roping event on April 20, Gass's husband approached Coffee and informed him that he did not own Durango, suggesting that the exchange of horses was not a permanent one. The Gasses then brought Ima Pasture Affair to the arena and tied the horse to Coffee's trailer. After Coffee informed an officer that the horse did not belong to him, the officer

instructed the Gasses that they had to remove the horse from the trailer. They complied and returned home with Ima Pasture Affair.

Shortly afterwards, Gass filed suit against Coffee and sought a writ of sequestration to recover Durango. Coffee answered and filed a counterclaim for damages and for declaratory relief. The case was submitted to a jury, who found that the parties had entered into an agreement for the exchange of the horses, that Coffee had substantially complied with the agreement, and that Coffee was the owner of Durango. The jury also found that Gass had not breached the agreement and awarded no damages to Coffee. Based on these findings, the trial court rendered judgment, ordering Gass to deliver any papers necessary to transfer title of Durango to Coffee.

## DISCUSSION

By her first point of error, Gass argues that the evidence was legally or factually insufficient to support the jury's finding that she and Coffee entered into a contract for the exchange of the two horses, Durango and Ima Pasture Affair. She further alleges that any agreement between herself and Coffee violated the statute of frauds, *see* Tex. Bus. & Com. Code Ann. § 2.201(a) (West 1994), and the Agriculture Code, *see* Tex. Agric. Code Ann. § 146.001 (West 1982), and is therefore unenforceable.

To review the evidence under a legal insufficiency or no-evidence point, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998). We will uphold the finding if more than a scintilla of evidence supports it. *Burroughs Welcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). The evidence supporting a

3

finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *Id.*

When reviewing the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if the supporting evidence is so weak or so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We will not substitute our judgment for that of the trier of fact merely because we might reach a different conclusion. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ).

A binding contract is formed when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.—San Antonio 1997, no writ). Here, Gass in essence contests the third element. When a meeting of the minds is the only element in dispute, the existence of a contract is a question of fact. *Id.* This element may be inferred from the circumstances surrounding the transaction. *Id.* It can arise from the parties' conduct from which one party can "reasonably draw the inference of a promise." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609-10 (Tex. 1972) (quoting 1 S. Williston, Contracts § 22A (1957)).

The jury in this case answered the following question in the affirmative: "Do you find that SUSIE NELMS GASS and LUKE LEON COFFEE entered into a contract for the sale of the horse known as 'Durango' in exchange for the horse known as 'Ima Pasture Affair'?" The jury,

4

however, was not asked to determine whether a meeting of the minds existed between the parties. Omitted elements are deemed found by the court in such a manner as to support the jury's verdict if no objection to the omission is made and the elements are supported by some evidence. Tex. R. Civ. P. 279; *Ramos v. Frito-Lay, Inc.*, 784 S.W.2d 667, 668 (Tex. 1990).

Gass claims that because the terms "buy" or "sell" were never used when discussing the exchange of the horses, there is no evidence that the exchange was intended to be permanent. Although the terms "buy" or "sell" were not used by the parties, the jury was presented with substantial evidence from which it could have concluded that the parties' actions implied a permanent exchange of horses. First, Coffee testified that when he approached Gass with the proposition of swapping horses, she responded, "Well, you're going to have to talk to Derek." So, he approached Derek, inquiring, "Well, Derek, if you want to trade I'll trade you my horse—my bulldogging horse for this horse . . . . Derek, do you want to trade?" to which Derek responded, "Well, yeah." Gass then replied, "If it's all right with Derek, it's all right with me." No one suggested that the trade was temporary during this conversation.

The following Thursday, Derek and Coffee met at the civic center and traded horses. At that time, Coffee handed Derek the papers for Ima Pasture Affair, and Derek told Coffee that he would gather Durango's papers and deliver them later. Coffee construed this trade as permanent: "There was no other reason for me to give him the papers to this horse if I was not trading it." In addition, Coffee testified that on at least one occasion after the horse trade, he encountered Gass at a rodeo event, and she made no mention of the trade being temporary, despite her awareness that

5

Coffee had given Derek the papers for Ima Pasture Affair, indicating that the exchange was permanent.

Coffee's brother, Lawrence, testified that he too was present when Derek and Coffee agreed to trade horses. Like Coffee, he heard Gass respond to Coffee's request to trade horses with, "If it's fine with Derek, it's fine with me." He did not hear Gass or Coffee refer to the trade as temporary. Lawrence was also present when Coffee and Derek actually exchanged horses. He testified that he saw Coffee hand the papers for Ima Pasture Affair to Derek, and opined that the trade did not look like a temporary one to him.

A third witness, Alton Sanders, was also present during the conversation between Derek and Coffee regarding the horse trade. He testified that when Coffee asked Gass about trading the horses, she replied, "Whatever [Derek] wants." Sanders did not hear anyone characterize the trade as temporary. He later offered to purchase Durango from Coffee.

Gass presented conflicting evidence. She testified that no one ever characterized the trade as a permanent one. To the contrary, she testified that she only intended that Coffee borrow Durango to season him.[1] With regard to Coffee's delivery of Ima Pasture Affair's papers, Derek testified that he mistakenly thought the papers were Coggins papers,[2] not transfer papers. And after

---

[1] According to Coffee's testimony at trial, "seasoning a horse" means participating with the horse in several different arenas so that the horse will become accustomed to participating in a variety of venues.

[2] "Coggins papers" refers to a document reflecting the results of a Coggins test. A Coggins test is an official test for equine infectious anemia. 4 Tex. Admin. Code § 49.1(a) (2001). Coggins papers may be checked when a horse crosses state lines or before a horse is allowed on rodeo grounds.

he and Gass discovered that the papers were indeed transfer papers, they tried to contact Coffee, but were unable to reach him.

We hold that the evidence presented amounts to more than a scintilla in support of the jury's verdict. And although Gass presented conflicting evidence, the jury was the sole judge of the witnesses' credibility and was entitled to resolve the conflicts. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Thus, we hold the evidence was both legally and factually sufficient to support the jury's verdict.

Gass also complains that if an oral contract existed, it did not comply with section 2.201(a) of the Business and Commerce Code. That section generally states that any contract for a sale of goods for the price of $500 or more is not enforceable unless in writing. Tex. Bus. & Com. Code Ann. § 2.201. Gass, however, ignores the exception to this rule found in subsection (c), which states, "A contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable . . . (3) with respect to goods for which payment has been made and accepted or which have been received and accepted . . . ." *Id.* § 2.201(c). Thus, in order to remove the agreement from the operation of the statute of frauds, Coffee must have established receipt and acceptance of the goods. *Wilson v. Remmel Cattle Co.*, 542 S.W.2d 938, 941 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.). The issue of receipt and acceptance is a fact issue. *Id.* Here, the jury found that Gass accepted Ima Pasture Affair, as reflected in its response to jury question number twelve. It is undisputed that Gass also received Ima Pasture Affair, since she had possession of the horse until the time of trial. *See* Tex. Bus. & Com. Code Ann. § 2.103(a)(3) (West Supp. 2001) (receipt of goods is "taking physical possession of them"). Coffee therefore established his affirmative defense, and the oral contract was not rendered unenforceable by the statute of frauds.

7

Gass next contends that section 146.001 bars judgment for Coffee. Section 146.001 provides in pertinent part:

(a) If a person in this state sells or transfers a horse, . . . the actual delivery of the animal must be accompanied by a written transfer to the purchaser from the vendor . . . .

(b) On the trial of the right of property in an animal sold or transferred under Subsection (a) of this section, the possession of the animal without the written transfer is presumed to be illegal.

Tex. Agric. Code Ann. § 146.001. The effect of this statute is to create a presumption of illegality, a presumption that may be rebutted. *First Nat'l Bank v. Brown*, 23 S.W. 862, 863 (Tex. 1892) (holding that under predecessor statute, sale of animal without written transfer is prima facie illegal but open to explanation) (quoting *Wells v. Littlefield*, 59 Tex. 556 (1884)); *Swan v. Larkin*, 28 S.W. 217, 217 (Tex. Civ. App.—San Antonio 1894, no writ) (holding that under predecessor statute, sale of animal without accompanying written bill of sale creates rebuttable presumption of illegality). Here, Coffee presented evidence successfully rebutting the presumption of an illegal agreement. Specifically, the jury heard evidence that Coffee and Gass had entered into an agreement to trade horses, and both parties had complied with the agreement by exchanging possession of the horses. The jury then concluded that a valid agreement existed between Coffee and Gass. Gass's first point of error is overruled.

By her second point, Gass contends that the trial court erred in rendering judgment in favor of Coffee because he elected the remedy of breach of contract damages, not specific performance, and the jury failed to find a breach of contract by Gass. We disagree with Gass's

8

interpretation of the court's judgment as a judgment for specific performance. "The purpose of specific performance is to compel a party who is violating a duty to perform under a valid contract to comply with his obligations." *Estate of Griffin v. Sumner*, 604 S.W.2d 221, 225 (Tex. Civ. App.—San Antonio 1980, writ ref'd n.r.e.). Here, Coffee sought a judgment declaring the ownership rights in Durango. He did not seek to compel Gass to perform a duty under the contract. The basis for his declaratory judgment action was that the duty had already been performed, *i.e.*, the parties had already exchanged horses. Indeed, the only reason Coffee did not have possession of Durango at the time of the trial was that Gass had obtained a writ of sequestration. Thus, the trial court ordered Gass to return Durango to Coffee, along with the necessary ownership papers in order to effectuate its judgment declaring Coffee the owner of Durango. Contrary to Gass's assertions, the trial court was not compelling her to perform an obligation that she had failed to perform under the contract. The contract had already been performed. We overrule Gass's second point of error.

By her third point of error, Gass alleges that the trial court erred in rendering judgment in favor of Coffee because the jury's answers to two of the questions presented in the jury charge are in fatal conflict. Question number eight asks the jury: "Do you find that SUSIE NELMS GASS and LUKE LEON COFFEE entered into a contract for the sale of the horse known as 'Durango' in exchange for the horse known as 'Ima Pasture Affair'?" Question nine inquired, "Do you find from a preponderance of the evidence that SUSIE NELMS GASS and LEON COFFEE did not form an agreement for permanently swapping or trading horses?" The jury answered "yes" to question number eight and "no" to question nine.

Jury answers are in fatal conflict if the answer given to one question would require judgment for the plaintiff and the answer given to the other would require judgment for the defendant. *Coastal Chem., Inc. v. Brown*, 35 S.W.3d 90, 99 (Tex. App.—Houston [14th Dist.] 2000, pet. filed). This Court may not strike down jury answers on the ground of conflict if there is any reasonable basis upon which they can be reconciled. *Love v. State*, 972 S.W.2d 114, 117 (Tex. App.—Austin 1998, pet. denied).

Here, the jury's answers do not fatally conflict. Question number eight asks whether the two parties entered into a contract to exchange their horses. The jury found that a contract had been formed. Question number nine inquires whether the parties failed to agree to swap horses. The jury answered no. The jury thus concluded that there was no failure to agree between the parties. The jury's finding that the parties contracted to swap horses is consistent with the jury's refusal to find that no agreement was formed. There is no fatal conflict between the answers to these two questions. Gass's third point of error is overruled.[3]

---

[3] Gass further argues that when considered in conjunction with the jury's answers to questions ten, fourteen, fifteen, sixteen, seventeen, and eighteen, its answer to question nine evidences that it found no agreement existed between the parties. The aforementioned questions generally ask whether a breach of the agreement occurred, whether Coffee changed his position to his detriment in reliance upon the agreement, and whether Coffee was damaged by Gass's conduct or breach. The jury answered no to each of the questions. The jury's answers, however, do not reflect a failure to find that an agreement existed. Rather, its answers are consistent with the judgment declaring Coffee the rightful owner of Durango. The jury's answers reflect that the parties had fully performed the agreement and that no breach existed.

# CONCLUSION

Having overruled all of Gass's points of error, we affirm the trial court's judgment.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed:   September 13, 2001

Do Not Publish

11