United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 7, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 03-11294
_____

RIMADE LTD., Via Alla Fontana 32,
6977 Ruvigliana, Switzerland;
GIAIT LTD., Alla Fontana 32, 6977
Ruvigliana, Switzerland; PNEUS ACQUI
S.P.A., Reg Barbato, 21, 15011 Acqui
Terme, Italia,

                                   Plaintiffs - Appellants,

                         versus

HUBBARD ENTERPRISES, INC., Etc., ET AL.,

                                                Defendants,

ROBERT M. HUBBARD, also known as
Bob M. Hubbard,

                                   Defendant - Appellee.
_____

Appeal from the United States District Court
for the Northern District of Texas
_____

Before JOLLY, WIENER, and PICKERING, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

     The Plaintiff tire companies sued Robert M. "Bob" Hubbard, seeking to hold him liable for the debt of his company, Hubbard Enterprises, Inc. ("HEI"), a tire wholesaler. After a bench trial, the district court held that the evidence did not support the Plaintiffs' contention that Hubbard used HEI as a corporate sham to defraud creditors, refused to hold Hubbard personally liable for HEI's debts, and entered a take-nothing judgment. The Plaintiffs

have appealed.  In this fact-intensive case, we are bound by the clearly erroneous standard of review, which is particularly important on the question of Hubbard's intent to defraud.  Accordingly, we are persuaded that the district court committed no reversible error in concluding that, under Texas law, HEI's corporate veil should not be pierced to reach Hubbard's personal assets.  We therefore affirm.

I

Rimade Ltd. ("Rimade") and Giait Ltd. ("Giait") are Swiss tire manufacturers that supply tires to Pneus Acqui, S.p.A. ("Pneus Acqui"), an Italian tire distributor and wholesaler (collectively, the "Plaintiffs").  One of Pneus Acqui's customers was Bob Hubbard and his business, HEI, a Tennessee corporation with its principal place of business in Fort Worth, Texas.  Hubbard, who was the president, sole shareholder and director of HEI during its rather brief existence, sold tires in Texas and surrounding states.

Pneus Acqui sold HEI tires on credit from 1998 to 2001.  It negotiated terms with Hubbard alone and shipped tires from Europe to Texas under standard invoices generated by Giait and Rimade. The Plaintiffs required that Hubbard maintain a standard letter of credit for a fixed amount that could be drawn on in the event that he failed to make a payment.  Hubbard opened a $350,000 letter of credit (the "Letter") with First Tennessee Bank ("First Tennessee") in April 1998, which the Plaintiffs allowed him to reduce to $150,000 a year later.

A

On June 20, 2000, Hubbard directed an HEI employee to email Rimade and ask if HEI could cancel its Letter. Rimade refused the request, as HEI owed Rimade about $300,000 at the time. As of August 31, 2000, all invoices from the beginning of the business relationship between the Plaintiffs and HEI, totaling over $4.3 million, had been paid in full. Shortly thereafter, HEI began to fail to make payments, but Hubbard induced the Plaintiffs to continue providing tires by promising that he would use the profits from these new tires to pay overdue invoices.

On January 30, 2001, Pneus Acqui employee Loretta Ferrarin emailed Hubbard to request that he increase HEI's Letter to $400,000 because the outstanding balance had reached over $1 million. Unknown to the Plaintiffs, however, their bank, SG Ruegg Bank SA ("SG Ruegg"), had informed First Tennessee that the Letter was no longer required. Accordingly, First Tennessee canceled the Letter and informed Hubbard of the cancellation by fax the day before Pneus Acqui sent its email. Hubbard responded to Pneus Acqui by stating that he could not increase the Letter; as Hubbard testified, he knew the Letter had been canceled but did not mention this fact to Pneus Acqui. Hubbard testified that he never intended to mislead the Plaintiffs, and that he made no effort to conceal the Letter's cancellation. Further tire shipments to Hubbard were still accompanied by invoices stating they were covered by the Letter.

On April 24, still believing the Letter to be in place, Ferrarin again wrote to Hubbard to state that, because HEI owed nearly $700,000 and had a Letter for only $150,000, future shipments would have to be paid for upon receipt. Sometime in May or June, the Plaintiffs finally learned from SG Ruegg that the Letter had in fact been canceled, at which point they stopped selling tires to HEI. Ferrarin testified that the Plaintiffs never would have made the on-credit sales to HEI between January and June 2001 had they known that the Letter had been canceled.

On August 30, after HEI had failed to pay down its overdue invoices, and knowing the Letter was no more, Ferrarin met with Hubbard in Texas to discuss resolution of the outstanding balance. At the meeting, Hubbard signed summaries that reflected HEI's debt of $227,922.68 to Rimade and $224,647.51 to Giait. Hubbard also signed a letter stating that he was giving Ferrarin six post-dated checks totaling $105,000 to begin a payment plan. Only two of the checks were honored, however, as Hubbard later instructed First Tennessee to stop payment on the remaining four.

At the time the complaint was filed in this matter, HEI and Hubbard stipulated that HEI owed the Plaintiffs $359,052 (exclusive of interest) -- and this is where the balance stood in July 2003. In sum, in the course of their dealings, the Plaintiffs sent tires to HEI that were invoiced for a total of nearly $6 million, all of which HEI either paid for or returned, with the exception of the $359,000 worth of tires at issue in of this litigation.

4

Hubbard also had extensive involvements with a number of other businesses owned and operated by Hubbard and his relatives (collectively the "Hubbard Businesses"), most of which sell and resell tires in Texas.[1] Hubbard and his sons, through their controlling interests, caused the Hubbard Businesses to engage in a variety of questionable business practices, including: 1) making loans to each other that were never collected; 2) renting property to each other without collecting the full rents; and 3) overextending credit to each other.

Of particular relevance to this case, between October 2000 and June 2001, the time when HEI was running up its debt to the Plaintiffs, HEI transferred over $1 million in assets, including the Plaintiffs' tires, to Tire Dealers Warehouse ("TDW"), a corporation owned and operated by Hubbard's sons. From April to August 2001, HEI transferred over $1.4 million in inventory to TDW on credit. TDW paid several hundreds of thousands of dollars to HEI during the first three quarters of 2001, but was unable to continue paying its debts thereafter. TDW ceased doing business as of March 2003, and sold all its assets to various entities, including other Hubbard Businesses. TDW still owes HEI over $1.9 million, and it is making payments to HEI's secured creditor.

---

[1] In the light of the stipulations in the parties' Joint Pretrial Order, there is no dispute as to Hubbard's involvement in the Hubbard Businesses, or in the Hubbard Businesses' activities.

Hubbard never caused HEI to so much as issue a demand letter to TDW, which is the only business to which HEI "overextended" credit -- though he did file a security interest for HEI against a TDW lease. Hubbard also never told the Plaintiffs that he was selling tires on credit to his sons' company, or that he was making no efforts to collect on those sales. Ferrarin testified that the Plaintiffs never would have continued making sales on credit to HEI if they had known about Hubbard's dealings with TDW.

According to Reginald Parr, the Plaintiffs' accounting expert, HEI was always insolvent by some definition during its short life, and it owed Hubbard over $400,000 at the time of the trial. Because HEI was a subchapter S corporation, its income was taxed as Hubbard's income, though Hubbard never received distributions as a shareholder. He did receive salaries of $88,000 in 2000 and $64,000 in 2001, as well as rental income from TDW (from his stake in Berry Street Properties, a Hubbard Business).

C

On October 8, 2002, the Plaintiffs sued HEI and Hubbard, charging that HEI breached its contract and that "HEI is the alter ego of Hubbard who used HEI to defraud Plaintiffs." In June 2003, the Plaintiffs moved for summary judgment (which motion they later supplemented) and Hubbard moved for partial summary judgment on the sole question of his own personal liability. In July, the district court denied the Plaintiffs leave to amend their complaint with new counts based on new evidence from discovery.

The district court then partially granted the Plaintiffs summary judgment, entering judgment against HEI in the amount of $359,052, plus interest and costs. It also denied the opposing motions for summary judgment on the veil piercing issue. Hubbard then stipulated that HEI ceased doing business in November 2002 and had disposed of all its assets at that time.

The case proceeded to a one-day bench trial in November 2003 on the issue of whether Hubbard had used HEI to defraud the Plaintiffs, thereby warranting veil piercing. The Plaintiffs called Ferrarin, Parr, and Hubbard. The defense called only Hubbard. The district court restated each of the five contested issues of fact from the Joint Pretrial Order and then orally announced that it was ruling for Hubbard in each instance without making any specific findings.[2] It then issued a brief Order,

---

[2]The jointly stipulated contested findings of fact were:

1. Whether Hubbard used HEI to defraud the Plaintiffs by convincing them to sell HEI tires when Hubbard knew HEI would never pay for them;

2. Whether Hubbard continued to order and accept tires from the Plaintiffs while knowing HEI could and would not make payment;

3. Whether Hubbard caused HEI to sell tires on credit to TDW despite knowing that TDW would never be able to pay;

4. Whether the Hubbards and Hubbard Businesses routinely failed to follow "regular commercial business practices";

5. Whether Hubbard engaged in a strategy of

7

stating that the Plaintiffs should be denied recovery because it could not find in their favor by a preponderance of the evidence as to any of the contested issues.  The Plaintiffs timely appealed.

II

The Plaintiffs contend that the evidence presented at trial establishes as a matter of law that Hubbard used HEI to defraud the Plaintiffs in two ways:  by fraudulently misrepresenting to the Plaintiffs the status of the Letter, and by transferring HEI's assets to TDW in fraudulent sales such that HEI would be unable to pay either the balance owed or the judgment.  As such, the Plaintiffs argue, the district court erred in not piercing the corporate veil and holding Hubbard personally liable for HEI's debts.

We review the district court's conclusions of law <u>de</u> <u>novo</u> and its findings of fact for clear error.  <u>Joslyn Mfg. Co. v. Koppers Co.</u>, 40 F.3d 750, 753 (5th Cir. 1994).  The clearly erroneous standard does not apply to factual findings made under an erroneous view of the controlling law.  <u>Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.</u>, 348 F.3d 469, 470 (5th Cir. 2003).

Under Texas law, "there are three broad categories in which a court may pierce the corporate veil: (1) the corporation is the

_____

defrauding creditors by using the Hubbard Businesses to acquire assets on credit and then selling the assets to other Hubbard Businesses, leaving creditors without recourse.

8

alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud." W. Horizontal Drilling v. Jonnet Energy Corp., 11 F.3d 65, 67 (5th Cir. 1994). The Texas Business Corporations Act sets additional requirements for piercing the corporate veil in cases based on claims of breach of contract. In such cases, the veil may be pierced where the defendant shareholder "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder." TEX. BUS. CORP. ACT art. 2.21(A)(2). Thus the alter ego and illegal purposes considerations are not at issue; as the present case is based on a breach of contract, we focus only on Hubbard's alleged use of HEI to perpetrate fraud.

A

We must first determine whether Hubbard, using HEI as a sham, perpetrated an actual fraud on the Plaintiffs when he failed to disclose to them that their bank had canceled the Letter. Texas law defines fraud as the "misrepresentation of a material fact with intention to induce action or inaction, reliance on the misrepresentation by a person who, as a result of such reliance, suffers injury." Trustees of the N.W. Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski, 27 F.3d 153, 157 (5th

9

Cir. 1994) (internal quotation marks and citation omitted).[3]   "A defendant's failure to disclose a material fact is fraudulent only if the defendant has a duty to disclose that fact." <u>Id</u>.  A duty to disclose "can arise by operation of law or by agreement of the parties," or by "some special relationship between the parties, such as a fiduciary or confidential relationship."   <u>Id</u>. Notwithstanding the above, "there is always a duty to correct one's own prior false or misleading statements," such that a speaker making a partial disclosure assumes a duty to tell the whole truth even when the partial disclosure was not legally required.  <u>Id</u>. (all citations omitted).

More recently, this Court reiterated that a duty to speak arises by operation of law when "one party voluntarily discloses some but less than all material facts, so that he must disclose the whole truth, i.e., material facts, lest his partial disclosure convey a false impression." <u>Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.</u>, 247 F.3d 574, 586 (5th Cir. 2001) (citation omitted).  In <u>Rhone-Poulenc</u>, this Court reversed a judgment in favor of the defendant with respect to a fraud claim because the defendant, when it went beyond the minimal formal disclosures

---

[3]<u>See</u> <u>also</u> <u>Menetti v. Chavers</u>, 974 S.W.2d 168, 175 (Tex. App. -- San Antonio 1998) ("Actual fraud by misrepresentation consists of a representation that is (1) material; (2) false; (3) knowingly false or made with reckless disregard for its truth or falsity; (4) made with the intention that it be acted upon by the other party; (5) relied upon by the other party; [and] (6) damaging to the other party.") (citations omitted).

10

required by the partnership, "assumed an affirmative duty to make full disclosures." Id. The defendant "could not remain silent after merely making partial disclosures that conveyed a false impression." Id.

The Plaintiffs argue that here, as in the cases where partial disclosure was held to obligate full disclosure, Hubbard's communications about the Letter conveyed a false impression -- that the Letter still existed after First Tennessee canceled it -- upon which the Plaintiffs relied to their detriment. Specifically, even though Hubbard knew that the Plaintiffs required a Letter to sell tires on credit, and received invoices stating that they were covered by the then-nonexistent Letter, he never disclosed that the Letter had been canceled. When Hubbard emailed Ferrarin to say that he could not increase the Letter, and when he made continued promises to pay outstanding balances, he never corrected the Plaintiffs' impression that the Letter remained effective. And Hubbard's misrepresentation was material because it induced the Plaintiffs to continue to sell to HEI on credit, sales for which they were never paid.

The Plaintiffs also contend that this fraud by incomplete disclosure should be attributed to Hubbard because his acts are indistinguishable from HEI's. They argue that, as HEI's sole director, shareholder, and president, Hubbard used HEI to take actions harmful to HEI: It was Hubbard who caused HEI to make a partial disclosure and thereby defraud the Plaintiffs. And it was

11

Hubbard who gained a direct personal benefit from the fraud in the form of his salary and S corporation income, thus satisfying the veil-piercing requirements of Article 2.21(A)(2).

Yet Hubbard had no duty to notify the Plaintiffs that their own bank had caused the Letter's cancellation. Moreover, both Rhone-Poulenc and Burzynski were summary judgment cases, and summary judgment is rarely proper in fraud cases because the intent required to establish fraud is a factual question "uniquely within the realm of the trier of fact because it so depends upon the credibility of witnesses." Beijing Metals & Minerals v. Amer. Bus. Ctr., 993 F.2d 1178, 1185 (5th Cir. 1993). To that end, the Rhone-Poulenc court stressed that the theory of fraud based on partial disclosure, viewed in the light most favorable to the non-movant, was sufficient to defeat summary judgment. 247 F.3d at 591. Similarly, Burzynski was decided on cross-motions for summary judgment where a doctor affirmatively seeking payment for "chemotherapy" indisputably failed to disclose that this chemotherapy was illegal. 27 F.3d at 156.

Here the case was tried to a judge who had an opportunity to evaluate the evidence and judge the credibility of witnesses. There was also direct, if self-serving, evidence of a lack of intent to deceive that supports the district court's determination: Hubbard twice took the stand to say he never intended to mislead the Plaintiffs. Under the circumstances here, where Hubbard paid more than $6 million to the Plaintiffs and ultimately had an unpaid

12

balance of less than $400,000, the court was within its discretion to believe him. Further, Hubbard caused HEI to pay over four times the amount of the Letter after the Letter was canceled -- the Letter guaranteed $150,000 and HEI paid down over $600,000. This evidence further supports the trier of fact's determination that there was no intent to defraud. It also shows that the Plaintiffs did not carry their burden to show that Hubbard's failure to tell them of the Letter's cancellation actually damaged them, given that Hubbard paid down more than the Letter's worth after its cancellation.

Indeed, if the Plaintiffs had immediately learned of the Letter's cancellation and at that point ceased doing business with Hubbard, as they testified they would have, they would have been worse off financially. This is so because Hubbard would have lost his supply of tires to sell, and so would not have been able to use the profit from the sale of new tires to pay old debts, as had been his practice. As it stands, from the time the Letter was cancelled until the Plaintiffs learned that the Letter had been cancelled (January 30, 2001 until May or June 2001), HEI paid the Plaintiffs a sum equivalent to all invoices during that time period plus some $300,000. The Plaintiffs' evidence thus does not establish proof of damages.

As the trier of fact, the district court weighed all the evidence, including Hubbard's credibility, when making its findings, and our examination of the record does not reveal clear

13

error with respect to Hubbard's use of HEI to defraud the Plaintiffs with respect to the Letter.

In sum, the district court correctly applied the law of partial disclosure: While Hubbard did nothing to correct the Plaintiffs' mistaken impression about the Letter, he also made no partial disclosures to cause or perpetuate that misunderstanding. His simple refusal to increase the amount of the Letter did not disclose a fact that would impose a legal duty to disclose his knowledge of the Letter's cancellation. It was, after all, the Plaintiffs' own bank that had canceled the Letter and had failed to communicate that fact to the Plaintiffs. Thus the district court's implicit finding that Hubbard lacked the intent to use HEI as a sham to defraud with respect to his personal letter of credit was not clear error. Hubbard does not dispute that HEI breached its contract with the Plaintiffs, or that he controlled HEI, but these facts alone are insufficient to pierce the corporate veil in this breach of contract case under Texas law.

B

Finding that the district court did not err with respect to the alleged fraud surrounding the Letter, we now turn to the Plaintiffs' argument that HEI's veil should be pierced because Hubbard used HEI to defraud the Plaintiffs by shifting inventory to TDW, with the knowledge that TDW would never pay. The Plaintiffs point to the record as showing that between October 2000 and June 2001, when Hubbard was ordering but failing to pay for the

14

Plaintiffs' tires, Hubbard was also transferring hundreds of thousands of dollars worth of tires to TDW -- a company that paid salaries to Hubbard's relatives and also paid rent to Hubbard himself. During a time of increasing demands for payment, the Plaintiffs contend, Hubbard was literally "giving away the store," knowing that HEI would never be paid and that any judgment against it would be worthless.

To support their argument, the Plaintiffs cite Texas courts that have pierced corporate veils where the indebted company transfers assets to a related company to avoid judgments or collection efforts. One court found that a company was used as a sham to perpetrate fraud when its owner shifted its funds to another of his companies to avoid liability. Love v. Texas, 972 S.W.2d 114, 119-20 (Tex. App. -- Austin 1998). Another court found a sole shareholder liable for company debts when he incorporated a new business to continue the business of a foreclosed company where the foreclosure sale was merely an attempt to avoid creditors. Klein v. Sporting Goods, Inc., 772 S.W.2d 173, 176-77 (Tex. App. -- Houston 1989).

In these and other cases, the defendants used companies they wholly controlled to defraud the plaintiffs for their own personal benefit. Here, argue the Plaintiffs, Hubbard similarly gained -- through his and his relatives' salaries and rental income -- by causing HEI to transfer its assets and thereby defraud the

15

Plaintiffs, thus satisfying the veil-piercing requirements of Article 2.21(A)(2).

Yet Hubbard did <u>not</u> have a personal interest in TDW, and merely selling on credit to TDW cannot be a fraudulent business tactic because TDW paid over $500,000 to HEI during the first three quarters of 2001 (pre-9/11) -- a time when Goodyear was considering investing in TDW. Surely selling on credit cannot be considered fraudulent, as <u>this is the way the Plaintiffs themselves transacted business with HEI</u>. Moreover, the receivables from TDW are being collected to the extent they can be: 1) all payments to TDW are currently going to First Tennessee, the secured creditor to which <u>HEI</u>'s receivables are pledged; 2) HEI took a security interest in a lease owned by TDW, and payments thereunder are going toward TDW's debt to HEI.

Further, the Plaintiffs need to prove actual fraud, and the trier of fact evaluated Hubbard's testimony and did <u>not</u> find that the Plaintiffs had proved that actual fraud had occurred by a preponderance of the evidence. <u>See</u> <u>Coury v. Prot</u>, 85 F.3d 244, 254 (5th Cir. 1996) ("The burden of showing that the findings of the district court are clearly erroneous is heavier if the credibility of witnesses is a factor in the trial court's decision."). The Plaintiffs' authorities are inapposite: <u>Klein</u> pre-dates the applicable version of Article 2.21, while <u>Love</u> reinforces Hubbard's position that <u>actual</u> (not constructive) fraud must be proven to

16

pierce the corporate veil where corporate liability stems from a breach of contract. <u>Love</u>, 972 S.W.2d at 118. We therefore hold that it was not clear error for the district court implicitly to find that HEI's credit sales were not made with any intent to harm Plaintiffs; therefore the Plaintiffs did not establish the actual fraud necessary to pierce the corporate veil.

Moreover, Hubbard has not taken a salary from HEI since 2001, lost money on loans to HEI, and also paid taxes on the company's earnings, which were deemed to be passed through to him as shareholder income (though no money was distributed). Thus the Plaintiffs cannot establish Hubbard's direct personal benefit from any fraud, nor indeed that they were harmed by sales to TDW because they never requested or relied on any representations by HEI regarding its customers.

In sum, the district court correctly applied the law of fraudulent transfer of assets: Once the court (implicitly) found that Hubbard lacked the intent to defraud with respect to the sales to TDW -- a finding that is not clearly erroneous -- it could not as a matter of law have found that he used HEI as a sham to perpetrate fraud.

### III

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

ENDRECORD

18

WIENER, Circuit Judge, dissenting.


I respectfully dissent.  To me, the factual findings of the district court, albeit they are terse, reflect that Hubbard knowingly and intentionally misused and disregarded his one-man corporation's form to disadvantage these plaintiffs, with whom he had done business for years.  His corporation's veil should be pierced to expose it as Hubbard's alter ego and make him personally liable for his corporation's debts to Plaintiffs-Appellants.

Even when Hubbard's acts and omissions are viewed in the context of the legal hurdles erected by the applicable law of Texas, he emerges as anything but an innocent, unsophisticated tire dealer.  He fraudulently stood mute and continued to do "business as usual" with these plaintiffs despite his certain knowledge of a key fact that he was duty bound to disclose, viz., that unbeknownst to his vendors, the letter of credit partially securing his corporation's obligations to them had been canceled.  Knowing full well that these plaintiffs were unaware that the security for these transactions had ceased to exist and that they would not sell merchandise to him in its absence, Hubbard not only continued to make unsecured purchases of tires, but proceeded to orchestrate duplicitous non-arms-length transfers of that merchandise from his wholly owned and operated corporation to entities owned and controlled by none other than his own sons.  He deliberately put this merchandise and its sales proceeds beyond the reach of his

uninformed, arms-length creditors and simultaneously made them available instead to his corporation's lending bank, a secured creditor to which —— not so coincidentally —— Hubbard was personally liable as guarantor. He obviously benefited personally from these intra-family machinations, not just from rent received and Sub-S corporation advantages realized, but from substantial reduction or elimination of his personal liability to his bank as well.

Like the district court, the panel majority errs by viewing each discrete fact as a snapshot —— "in a vacuum" —— rather than as a series of links in a continuous and evolving chain of ongoing business transactions between the parties. Far too much is made of the unrelated fact that the letter of credit happened to get canceled through the inadvertence of the plaintiffs' bank; far too much emphasis is placed on meaningless statistics of in-and-out sales and payments; far too little weight is given to the financial advantages that Hubbard realized personally through the totality of his manipulation of "his" corporation; totally ignored is the concept of attribution, the ascribing of the acts of one party to another closely related party; entirely unrecognized is the commercial fact that the letter of credit was not meant to serve as full collateral but as a safety net to hold the vendors' potential losses to a manageable risk level; unrealistic is the treatment of the arms-length transactions between these litigants as

20

indistinguishable from the non-arms-length transactions among family members.

Except for Hubbard's wide-eyed, self-serving testimony that he intended no fraud, all <u>objective</u> evidence demonstrates, to my satisfaction at least, that this is the very kind of case that cries out for the piercing of the corporate veil to hold its sole shareholder personally liable to those he duped by interposing his corporate alter ego and remaining silent in the face of his duty to inform. If nothing else, we today re-affirm the age-old adage that "debtors either die or move to Texas." Despite my sincerely genuine respect for the district court and my learned colleagues of the panel majority, I am constrained to dissent.