James T. Campbell, Justice
Appellants, AvenueOne Properties, Inc. and Homer Garrison, appeal from the judgment in favor of appellee KP5 Limited Partnership, finding appellants jointly and severally liable for breach of a commercial lease. We will reverse the trial court's judgment against Homer Garrison and otherwise affirm.
Factual and Procedural Background
By amended pleadings, KP5 asserted a breach of contract claim against AvenueOne and Garrison, alleging AvenueOne defaulted in its obligations under a 72-month extension of its lease of space owned by KP5, signed in January 2011. It alleged Garrison, who was AvenueOne's president, had individual liability for the corporation's default through alter ego and similar theories for "piercing the corporate veil."
The parties stipulated that AvenueOne and KP5 entered into a valid contract; that KP5 performed its contractual obligations; that AvenueOne breached the contract; and that KP5 mitigated its damages but sustained damages of $118,543.73. The only issues addressed at trial concerned Garrison's individual liability for AvenueOne's breach of contract.
The case was tried to the bench. The court heard testimony from Garrison and from Ross Plummer, AvenueOne's former chief financial officer, and received exhibits. After the court signed its judgment holding Garrison and AvenueOne jointly and severally liable, it issued findings of fact and conclusions of law.
The evidence and the court's findings of fact reflect that Garrison was an established Austin real estate broker and AvenueOne was an established real estate brokerage company when Garrison acquired AvenueOne and merged it with his existing operation. The findings recite that Garrison purchased AvenueOne in 2009 and thereafter was its president and sole shareholder, "the only individual with financial ownership of" the corporation.
AvenueOne's lease of space from KP5 was to expire in August 2011 but Garrison extended it for an additional seventy-two months by a lease signed in January 2011. Garrison's relationship with AvenueOne's real estate agents deteriorated, however, and by August 2011 reached the point that all twenty-four agents signed a letter demanding that he resign as president and "dissolve the merger" of AvenueOne with his operation. He refused, and the agents shortly left the company.
One of the issues within AvenueOne concerned Garrison's cash management practices, which differed from those followed *645 by the company's prior shareholders. Before he acquired it, AvenueOne's shareholders were its real estate agents. Plummer, who had been employed by the company since 2007, testified the company had maintained a "substantial cash reserve."
The evidence shows that, as sole shareholder, Garrison took compensation in amounts and in a manner that Plummer considered improper. The trial court's findings state that Garrison took $589,500 in "disbursements" from AvenueOne in addition to his annual salary between May 2009 and April 2011. It found he received an annual salary of $328,000 after becoming AvenueOne's president, and a salary of $372,113.74 between January 2011 and April 2011. Garrison agreed Plummer told him many times he could not "live out of the till." Plummer testified he eventually refused to sign Garrison's requested compensation checks, and said Garrison then began directing a company accountant to prepare the checks, and signed them himself. In his testimony, Plummer also identified other expenditures he considered improper, including a payment to Garrison's housekeeper, costs to prepare Garrison's personal tax returns, and tax return-preparation and other expenses associated with Garrison's former company.
AvenueOne was late with payment to its former shareholders of a deferred payment due them under the merger agreement. Evidence also shows that, under Garrison's control, AvenueOne did not maintain some relationships from which it previously had benefitted, such as its membership in a prestigious association of realty companies, and did not keep up its recruitment of new or replacement real estate agents.
A long-time friend of Garrison on three occasions wired funds to AvenueOne, totaling $300,000. Garrison testified the funds were commissions he had earned in the past and reimbursement for property taxes AvenueOne had advanced for his friend. Garrison acknowledged he had no written agreement with his friend documenting the reasons for the wired funds. The court found "Homer Garrison used his personal funds to cover AvenueOne's payroll."
The trial court found Plummer's testimony concerning the compensation and other expenditures to be credible; its findings characterize Garrison's actions as "diverting funds to his personal accounts." The court also found Garrison "knew he could not continue diverting funds to his personal accounts, as his chief financial officer Ross Plummer informed him in an email dated July 7, 2011." Despite Plummer's advice, the court found, Garrison "continued diverting funds." Under questioning by the court, Garrison acknowledged that his actions operated "[t]o the detriment of AvenueOne."
The court further found that Garrison's withdrawal of the $589,500 from AvenueOne "caused the corporation to be unable to meet its financial obligations, rendering it insolvent." It is undisputed that, despite the wired funds, by October 2011 AvenueOne was virtually out of cash. It vacated KP5's space late that month, and ceased making lease payments.
Garrison created Garrison Real Estate, LLC, in January 2012; its certificate of formation was filed with the Secretary of State on January 24, 2012. The certificate states the LLC was to be managed by Garrison and his wife. The court found that when Garrison Real Estate was created, "AvenueOne was still an active corporation." The findings state Garrison Real Estate and AvenueOne "conduct the same business" and are "both brokerages." It found that Garrison Real Estate sold three houses while AvenueOne was "still open." The three houses were sold during July *646 and August 2012, with commissions totaling $201,900. The court also found that "Garrison changed the listing information ... to claim that houses sold by AvenueOne were sold by Garrison Real Estate." Garrison filed AvenueOne's certificate of termination with the Secretary of State on November 9, 2012. The court found Garrison "took all receivables of AvenueOne after the business closed, but before AvenueOne became inactive."
Analysis
Garrison brings five issues on appeal, asserting (1) the trial court erred in a conclusion of law stating that AvenueOne's corporate veil could be pierced absent proof that it was used to perpetrate actual fraud on KP5 for Garrison's direct personal benefit; (2) there was no evidence, or factually insufficient evidence, showing actual fraud was perpetrated on KP5 primarily for Garrison's direct personal benefit; (3) the trial court erred by disregarding the express waiver of personal liability contained in the lease; (4) no, or factually insufficient, evidence supported piercing the corporate veil under any of the theories alleged; and (5) Garrison had no personal liability for AvenueOne's breach of the lease.
Issue Two-Sufficiency of Evidence
We begin with Garrison's second issue, challenging the sufficiency of the evidence to prove that actual fraud was perpetrated on KP5, and that such actual fraud was primarily for Garrison's direct personal benefit.
We review the trial court's findings of fact for legal and factual sufficiency of the evidence by the same standard applied to a jury verdict. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996) ; Anderson v. City of Seven Points , 806 S.W.2d 791, 794 (Tex. 1991) ; see City of Keller v. Wilson , 168 S.W.3d 802, 827-28 (Tex. 2005) (describing legal sufficiency standard of review); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) (describing factual sufficiency standard of review). We review a trial court's conclusions of law de novo to determine their correctness and will uphold conclusions if the judgment can be sustained on any legal theory supported by the evidence. BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002).
There is no dispute on appeal that, under the Business Organizations Code, Garrison's personal liability for KP5's damages depends on proof that he caused AvenueOne to be used for the purpose of perpetrating and did perpetrate an actual fraud on KP5 primarily for Garrison's direct personal benefit. TEX. BUS. ORGS. CODE ANN. § 21.223 (West 2017) (providing shareholder may not be held liable for contractual obligation of corporation absent such actual fraud); see SSP Partners v. Gladstrong Invs. Corp. , 275 S.W.3d 444, 455-56, n.57 (Tex. 2008) ; Shook v. Walden , 368 S.W.3d 604, 614 (Tex. App.-Austin 2012, pet. denied). AvenueOne alleged Garrison was individually liable for the corporation's lease obligation under theories of alter ego, use of corporation as a sham to perpetrate a fraud, and use of corporation to evade a legal obligation. The trial court found he was liable under all three theories, and found he caused AvenueOne to perpetrate an actual fraud for his direct personal benefit.
The Texas Supreme Court and other Texas courts have detailed the history behind the statutory provision now contained in sections 21.223 and 21.224 of the Business Organizations Code. See, e.g. , SSP Partners , 275 S.W.3d at 455 ; Willis v. Donnelly , 199 S.W.3d 262, 271-72 (Tex. 2006) ; TecLogistics, Inc. v. Dresser-Rand Grp., Inc., 527 S.W.3d 589, 599 (Tex. App.-Houston [14th Dist.] 2017, no pet.) ; Shook , 368 S.W.3d at 611-13. It is unnecessary *647 for us to repeat that history here, but it begins with the 1986 opinion in Castleberry v. Branscum , 721 S.W.2d 270 (Tex. 1986), in which the court held "the corporate structure could be disregarded on a showing of constructive fraud, even without actual fraud." SSP Partners , 275 S.W.3d at 455.
Castleberry affirmed the imposition of individual liability on two corporate shareholders, Branscum and Byboth, for a promissory note signed by the corporation and given to Castleberry, another shareholder, in payment for the corporation's purchase of his shares. 721 S.W.2d at 274. Castleberry sold his shares back to the corporation after a disagreement over Branscum's formation of a business that competed with the corporation's business. After the buy-out of Castleberry's shares, the corporation made the first $1000 installment payment under the note and then defaulted on the remaining $41,000. Id.
Evidence showed that after the buy-out, Branscum's business "began to take over more and more" of the corporation's business. A third company was formed, and all three "were all in the same business and all operated out of [Branscum's] residence." Under the control of Branscum and Byboth, the corporation's business withered and Branscum's company prospered. The third company was formed after Castleberry filed suit, and Byboth conceded at trial that it was formed because of Castleberry's suit. After the third company was formed, Byboth and Branscum terminated the corporation's contract with its major customer and obtained the same work for that customer for their newly-formed company. They sold the corporation's business assets to "independent contractors" of their new company and paid the proceeds to themselves as "back salaries." 721 S.W.2d at 275.
There was evidence of the intent behind Branscum's actions. After Castleberry filed suit, Branscum told his wife Castleberry "would never get a dime ... that he would open the company in another name so that [Castleberry] wouldn't get paid." He had made similar statements earlier. Id. at 274-75.
The court's opinion held:
We hold that this is some evidence of a sham to perpetrate a fraud. A jury could find that Byboth and Branscum manipulated a closely-held corporation ... and formed competing businesses to ensure that Castleberry did not get paid. Castleberry had little choice but to sell his shares back to the corporation. While this evidence may be no evidence of intentional fraud, constructive fraud, not intentional fraud, is the standard for disregarding the corporate fiction on the basis of a sham to perpetrate a fraud.
In determining if there is an abuse of the corporate privilege, courts must look through the form of complex transactions to the substance. The variety of shams is infinite, but many fit this case's pattern: a closely held corporation owes unwanted obligations; it siphons off corporate revenues, sells off much of the corporate assets, or does other acts to hinder the on-going business and its ability to pay off its debts; a new business then starts up that is basically a continuation of the old business with many of the same shareholders, officers, and directors.
721 S.W.2d at 275 (citations omitted).
In 1989, the Legislature began the amendments to Texas corporation laws that have led to the current sections 21.223 and 21.224. As the court noted in SSP Partners , the legislative actions were a rejection of the view expressed in *648 Castleberry in certain cases[1] in favor of a "stricter approach to disregarding the corporate structure...." 275 S.W.3d at 455.
In a 1998 case involving facts it found comparable to those in Castleberry , but not subject to section 21.223 because it did not involve a contractual obligation, the Austin Court of Appeals upheld a judgment against corporate shareholders based on a jury finding that they used the corporation as a sham to perpetrate fraud. Love v. State , 972 S.W.2d 114, 120 (Tex. App.-Austin 1998, pet. denied). The court rejected an evidentiary-sufficiency challenge, and in doing so noted the evidence showed circumstances similar to other Texas cases, observing "courts have consistently pierced the corporate veil when the pattern of the sham is such that shareholders of a corporation with unwanted obligations siphon off revenues and sell assets, or do other acts to hinder the company's ability to pay its debts, such as start up a new business with the same shareholders." Id. (citing, inter alia , Castleberry , 721 S.W.2d at 274-75 ). So far as the parties' briefing and our research have shown, however, the Austin court has not had occasion to apply the statutory actual fraud standard to facts fitting the pattern of conduct shown in Castleberry and Love .
AvenueOne argues the evidence in this case "clearly established that Garrison siphoned off AvenueOne's corporate assets for his own benefit and then started up a new real estate business to continue marketing the listings that previously had been with him at the now defunct AvenueOne."
The Castleberry opinion distinguished actual fraud from constructive fraud with this language:
Actual fraud usually involves dishonesty of purpose or intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests.
721 S.W.2d at 273 (quoting Archer v. Griffith , 390 S.W.2d 735, 740 (Tex. 1964)).
In cases applying section 21.223 and its predecessor provisions, several Texas courts of appeals have made use of the statement from Castleberry , and have defined the term actual fraud as "dishonesty of purpose or intent to deceive." See TransPecos Banks v. Strobach , 487 S.W.3d 722, 730 (Tex. App.-El Paso 2016, no pet.) (listing cases); Dick's Last Resort of the W. End, Inc. v. Market/Ross, Ltd. , 273 S.W.3d 905, 909 (Tex. App.-Dallas 2008, pet. denied) ; Menetti v. Chavers , 974 S.W.2d 168 (Tex. App.-San Antonio 1998, no pet.).[2]
There are opinions upholding the sufficiency of evidence similar to that in Castleberry , and similar to that we face here, to prove conduct involving "dishonesty *649 of purpose or intent to deceive" and thus actual fraud. Latham v. Burgher , 320 S.W.3d 602 (Tex. App.-Dallas 2010, no pet.), is illustrative. Latham and his wife were the sole shareholders of their roofing company, a corporation. 320 S.W.3d at 609. Shortly after receiving a demand letter from an attorney for a dissatisfied customer, threatening suit, Latham dissolved the corporation and distributed its assets to the shareholders without making provisions for its possible liability to the customer. Id. The customer sued the corporation and Latham, and obtained a judgment imposing joint and several liability. In his appeal challenging the sufficiency of the evidence supporting the jury's finding of alter ego, Latham emphasized the evidence of the corporation's separate existence from its shareholders. The court rejected Latham's challenge, finding the evidence indicated the corporation was his mere business conduit. Regarding the evidence of actual fraud, the court said Latham's arguments "suggest [the plaintiff] should look to [the corporation] to be made whole, but Latham himself destroyed that option when he dissolved [the corporation.] And having dissolved the corporation, he took its assets and property for himself. A rational juror could have decided that holding only the non-existent [corporation] responsible would result in injustice. A rational juror could also have decided Latham's conduct in dissolving the corporation in the face of [the plaintiff's] claim represented dishonesty of purpose or an intent to deceive, i.e., actual fraud." 320 S.W.3d at 610 ; see also Tryco Enters. v. Robinson , 390 S.W.3d 497, 510-11 (Tex. App.-Houston [1st Dist.] 2012, pet. dism'd) (similar conclusion).
The difficulty we see with the application of Castleberry 's"actual fraud" standard to such conduct, however, arises from the Castleberry opinion itself. The court there described actual fraud, but did not say the conduct of Branscum and Byboth demonstrated actual fraud; the court said it exhibited constructive fraud. 721 S.W.2d at 275. In that regard, we find persuasive Justice Massengale's opinion in Tryco Enterprises , in which he pointed out the incongruity of a holding that conduct fitting the pattern of that described in Castleberry will meet the definition of actual fraud, when the Castleberry opinion states that the evidence in that case "may be no evidence" of intentional fraud. Tryco Enters. , 390 S.W.3d at 529 (Massengale, J., concurring in part and dissenting in part).
Because this case was transferred to our Court from the Austin Court of Appeals,[3] we also have carefully considered the Austin court's opinion in Shook. 368 S.W.3d 604. That case required the court to consider the application of the requirements of section 21.223 to limited liability companies. In the course of its thorough analysis of that issue, the court described the history of the law of veil-piercing in Texas and the nature of the Legislature's actions on the subject beginning in 1989. 368 S.W.3d at 611-12. Later in the opinion, the court described the "balancing of competing policy interests" involved in the application of veil-piercing principles which, the court said, "are ultimately matters of economic regulation." Id. at 619. Continuing, the court observed that the manner in which the "competing considerations are weighed determines both the nature of 'abuse' that is said to warrant veil piercing and how such 'abuse' is proven." Id. at 620. Describing the Legislature's 1989 amendments to *650 former Business Corporation Act article 2.21 and subsequent statutory amendments, the court noted "the Legislature struck a balance that differed markedly from that of the Castleberry court with respect to veil piercing to impose individual liability for corporate contractual obligations...." Id. Concluding its discussion before turning to the facts and arguments of the parties before it, the court commented on the appropriateness of judicial deference to the Legislature's policy judgments in this area, observing that "[s]uch deference is especially appropriate when ... we are addressing matters of economic regulation, an arena in which the Legislature possesses institutional competence superior to that of the judiciary...." Id.[4]
We cannot conclude that we would give the level of deference to the Legislature's policy judgments as the Shook opinion describes if we merely apply the label "actual fraud" to the type of conduct the Castleberry court has said constituted constructive fraud. For these reasons, we agree with Garrison that the evidence before the trial court was legally insufficient to prove he caused AvenueOne to be used for the purpose of perpetrating and did perpetrate an actual fraud on KP5 primarily for his direct personal benefit, as statutorily required.[5]
We do not ignore the trial court's findings of fact regarding representations made to KP5. The court found that Garrison represented to KP5 that AvenueOne would occupy the leased space for seventy-two months and renovate the space. It found that "AvenueOne was financially unable to pay the lease for seventy-two months or afford renovations when these representations were made." It further found that AvenueOne vacated the space after ten months and never completed the renovations, and that KP5's managing partner would not have entered the lease if it had known "these representations were not true."
Garrison argues the "representations" are merely obligations stated in the lease and are not evidence of actual fraud perpetrated by Garrison. See Formosa Plastics Corp. United States v. Presidio Eng'Rs & Contrs., 960 S.W.2d 41, 45 (Tex. 1998) ; Menetti , 974 S.W.2d at 175 (finding evidence of misrepresentations insufficient to prove actual fraud). The only evidence we find of a representation made outside the terms of the lease itself is contained in a November 2011 letter from KP5 to Garrison, giving notice of default. Among the unpaid items listed in the letter is "$7,765.08 to be repaid to the KP5 LLP based on your personal representations that you would complete extensive upgrades to the leased property and that you have abandoned instead." This also is no *651 evidence of actual fraud perpetrated primarily for Garrison's direct personal benefit. See Menetti , 974 S.W.2d at 175.
We sustain his second issue.
Without evidence sufficient to permit the imposition on Garrison of liability for AvenueOne's contractual obligation, the judgment against him cannot be sustained. We therefore need not address his other four appellate issues. TEX. R. APP. P. 47.1.
We reverse the trial court's judgment insofar as it imposed liability on Homer Garrison, individually, and render judgment that KP5 Limited Partnership, take nothing against him. Otherwise, the judgment is affirmed.

With regard to individual liability under alter ego or similar theories, section 21.223 applies to "any contractual obligation of the corporation or any matter relating to or arising from the obligation...." Tex. Bus. Orgs. Code Ann. § 21.223 (West 2017).

KP5 emphasizes the Dallas Court of Appeals' opinion in Dick's Last Resort , in which the court rejected Market/Ross's contention that the predecessor of section 21.223 required proof of fraud by misrepresentation or omission to satisfy the definition of actual fraud. 273 S.W.3d at 909. The court found, instead, that the trial court properly instructed the jury that " 'actual fraud' involves conduct involving either dishonesty of purpose or intent to deceive." Id. at 909. We have no disagreement with the definition of actual fraud given the jury in Dick's Last Resort. 273 S.W.3d at 909. Our concern is with the sufficiency of the evidence presented to meet that definition.

See Jackson Walker, LLP v. Kinsel , 518 S.W.3d 1, 10 (Tex. App.-Amarillo 2015) (aff'd, Kinsel v. Lindsey , 526 S.W.3d 411 (Tex. 2017) (citing Tex. R. App. P. 41.3 and stating our obligations in transferred cases regarding caselaw of transferor court).

We note also that we do not read the court's Shook opinion as expressly holding that the Castleberry court's description of "dishonesty of purpose or intent to deceive" is the definition of actual fraud to be applied under section 21.223. While the court cites that description at a point in its opinion, 368 S.W.3d at 622, it elsewhere indicates actual fraud is "that characterized by deliberately misleading conduct." Id. at 620.

There is another factor at work in this case. The AvenueOne-KP5 lease contained a section, entitled "Limitation of Liability," stating, "No shareholder, director, or officer of [AvenueOne] shall be personally liable for the performance of any of [AvenueOne's] obligations under this Lease." Garrison contended at trial, and argues in his third issue on appeal, that the section relieves him of liability to KP5 on the veil-piercing theories. KP5 argues the language cannot be read so broadly, and cannot be enforced by Garrison because he is not a party to the contract. We need not, and do not, resolve those issues, but we do say the presence of that language in the contract distinguishes this case from Latham , 320 S.W.3d 602, and likely from most other similar cases.