**Opinion filed July 20, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00072-CV
_____

## BRIAN GAGE; JASON COGBURN; EPIC ENERGY SERVICES, L.P.; AND EPIC HOLDINGS, LLC, Appellants

## V.

## BOBBY SIMMONS; CATHERINE SIMMONS; JODY FINLEY, INDIVIDUALLY AND D/B/A J&W SERVICES; AND ORBIT PLASTIC PIPE, INC. D/B/A ORBIT CONSTRUCTION, Appellees

### On Appeal from the 385th District Court
### Midland County, Texas
### Trial Court Cause No. CV54421

## M E M O R A N D U M   O P I N I O N

After a bench trial, the trial court rendered judgment against Appellants, Brian Gage, Jason Cogburn, Epic Energy Services, L.P., and Epic Holdings, LLC, for

common-law fraud and awarded benefit-of-the-bargain damages to Appellees, Bobby Simmons, Catherine Simmons, and Jody Finley.[1]

Appellants assert three issues on appeal: (1) the evidence is legally and factually insufficient to support the trial court's finding of fraud and rendition of judgment in favor of Appellees based on that finding; (2) the trial court erred when it awarded Appellees benefit-of-the-bargain damages because Appellees did not plead, request, or provide evidence to support such an award; and (3) many of the trial court's findings of fact constitute inappropriate statements of opinion or are not supported by the evidence. We affirm.

## I. *Factual Background*

This is a business deal gone awry. Appellants owned a company, Epic Energy Services, LLC (Epic), that offered an environmentally friendly process of repurposing drill cuttings retrieved from oilfield operations into road-building materials. The idea for the process originated with Jody, who had previously operated a company that offered a similar process in another state. Jody approached Jason with the idea of beginning a business in Texas that specialized in the repurposing process; they later obtained a permit from the Texas Railroad Commission. Because Jason and Jody knew each other well—they had grown up in the same town and attended the same high school—they did not discuss the need for a formal partnership agreement. Jody testified that he had been involved in many deals with Jason in the past and that they had always conducted their business affairs in an informal, and fair, manner.

Unbeknownst to Jody, Jason had formed Epic without including Jody as a member. The permit was issued to Epic by the Railroad Commission. Later, Jason

---

[1]As the trial court did in its findings of fact and conclusions of law, we refer to the parties by their first names, or collectively as "Appellants" and "Appellees."

amended the company's formation documents to include his accountant, Brian Gage, as a partner. Brian had initially only advised Jason regarding the venture, but he ultimately contributed $100,000 of capital and became a partner with Jason. Jason and Brian thereafter added two more partners, Rick Weatherl and Jon Bruner, who also contributed capital to Epic. Jody testified that he was not aware of any of this at the time.

For the first several years of Epic's existence, it struggled to obtain customers. Jody continued to work in furtherance of the company, supplying equipment and labor. Eventually, Jody suggested to Jason that they approach Bobby and Catherine Simmons, friends of Jody's who had a successful oilfield construction business (Orbit) with many clients of the type that Epic was pursuing.

Bobby and Catherine's large customer base, their contacts, and their existing relationships with oilfield companies presented an extremely valuable asset for Epic—access. Bobby testified that: "Orbit was the crutch to help Epic get off the ground. And obviously they weren't off the ground or they would have never called us to begin with." Orbit had approximately fifty master service agreements (MSAs) in effect with various oilfield-related companies. These MSAs are essential to the success of an oilfield service company, like Epic, because they are a prerequisite to obtaining any service job for oilfield-related companies.

On the other hand, Epic's business idea offered potentially substantial profits for its partners. Bobby testified that, in his estimation, Epic could generate $32,000 per day in revenue for a single client, and that they likely would be able to work twenty-two days per month for this client. That projected revenue alone would have exceeded $700,000, all from a single client. And indeed, after the events that led to this litigation, Epic was able to obtain a client for which they were able to perform the repurposing process for over a year. Jason and Brian testified that, in 2018 and

2019 combined (after Appellees were no longer involved in Epic), the company collected millions in revenue.

Jody, Jason, Bobby, and Catherine met in February of 2017 to discuss business opportunities. Jody, Bobby, and Catherine testified that, at that meeting, they discussed dividing the ownership of Epic: 50% ownership for Bobby and Catherine and 50% ownership between Jody and Jason. Jason denied discussing ownership percentages at this meeting.

The four met again on March 3, 2017; this time Brian also attended. Brian testified that, at this meeting, he explained that Epic Energy Services, LLC was a "partnership," but that they could convert Epic into a limited partnership as part of a deal to include Bobby and Catherine. Brian illustrated this proposal by sketching an example diagram which showed how a potential division of interests would function in a limited partnership. Jason testified that the parties discussed many ways that their partnership could be structured, and that Brian's diagram was simply one example of many. Brian testified that, after he sketched the diagram, Jody quickly printed a non-compete agreement and either Bobby and Catherine or Jody requested that everyone sign both the diagram and the non-compete agreement.

Bobby, Catherine, and Jody each testified that, at the March 3 meeting, Jason and Brian agreed that each of them would own 20% of the partnership. Brian sketched a rough diagram to illustrate the structure of the partnership. According to that diagram, each of the five individuals would own 19.8% of the limited partnership, and the remaining 1% of the company would be held in a general partner LLC, for tax purposes.[2] All five of them signed this diagram at the meeting. They

---

[2]Although the diagram did not specifically designate a 1% ownership interest in the general partner, each of the Appellees testified that the agreement was that they would each own a 20% interest. The diagram illustrates a five-way partnership in which each partner owns 19.8% in the limited partnership and the general partner owns 0.2%.

also signed a non-compete and confidentiality agreement. According to Bobby and Catherine, in addition to the diagram, the parties discussed and agreed at the meeting that no partner would withdraw any money from the company until it was profitable, each would take 20% of the company profits, and all would share equally in the expenses and losses.

Brian testified that the diagram was only an illustration, and that Appellees had no reason to believe it was anything more. He further testified that Jody was included in the diagram only to reconcile the math because they had discussed that Bobby and Catherine would each receive a 20% interest. He stated: "[A]s it turned out, there were five people in the room, and so I was drawing the illustration to try to be complete about if we had five people, that is what it would look like."

Brian did not tell Appellees about the other partners in Epic because, he claimed, it was only the first meeting and they had only known each other for about two hours; he wanted to simply "get a feel" for whether there was a mutual interest in going into business together. Jody testified that he was unaware that Jason had other partners in the business, including Brian.

Brian and Jason did not tell Appellees that they were required to sign a formal partnership agreement in order to become partners or owners in Epic. Brian never explained that the ownership interest each of them may receive was dependent on the forthcoming partnership agreement, not the diagram. Nor did Brian and Jason tell Appellees that they intended to control Epic themselves, that they would be the sole general partners in the holding company, or that they did not intend to include Jody in Epic at all.

Appellees testified that at no point during the March 3 meeting did Brian or Jason represent that the diagram was simply an illustration and not an agreement. Appellees also testified that they each understood that they were partners and part-

owners in Epic after March 3, based on the signed diagram and their discussions at the meeting. Appellees further testified that, if Brian and Jason had represented that Appellees were not partners in the venture, they would not have agreed to anything or have performed any work in furtherance of Epic.

Brian conceded that the diagram that he sketched on March 3 was false. He also stated that, after the meeting, he expected Appellees to work in furtherance of Epic from that day forward. He testified that the diagram was "a piece of paper with Bobby and Catherine's percentage [so] that they could feel confident that we were going to include [them] in our partnership agreement." Jason testified that he and Brian signed the diagram because they wanted to use Bobby and Catherine's MSAs for Epic's venture. According to Brian, "[Bobby and Catherine] could rely on the fact that . . . the interest that was on that paper would be in the partnership agreement."

However, Brian denied that the same was true for Jody. He claimed that the March 3 meeting was not about Jody joining Epic; rather, it was only about Bobby and Catherine. Brian testified that, although he did not state this to anyone, Jody could not rely on the diagram, but Bobby and Catherine could. Brian also agreed that the diagram showed that Bobby, Catherine, and Jody each would own 20% of the general partner-holding company, Epic Holdings, LLC.

Control of Epic was essential to Bobby and Catherine. Bobby and Catherine offered a valuable asset to Epic because of their existing clientele and business relationships, and they expressed concern about harming those relationships or allowing (in their estimation) unproven or poor businessmen like Brian and Jason to have a controlling influence over their reputations.

Bobby testified that he would not have done any work for Epic's benefit if he had known that Jason and Brian were going to control the business. He testified

that, with Catherine and Jody, the three of them would have likely controlled Epic. Bobby further stated that if he had known that Jason and Brian had no intention of including Jody in Epic, he would not have agreed to the deal. In other words, Bobby and Catherine knew that Jody was essential to their ability to control Epic because he was a friend and, with him, they would control the majority that was needed of the group of five partners as represented in the diagram.

Bobby testified that control of the company was extremely important to he and Catherine because they and Jody had a successful business track record. On the other hand, he did not know Brian Gage but in Bobby's estimation, Brian, as an accountant, did not know anything about oilfield services. With respect to Jason, Bobby and Jody knew that Jason had not been successful in business in the past. But because Jason had secured the permit for the repurposing process, he had to be included in the venture.

Despite this, Jason and Brian had no intention of permitting anyone to control Epic, other than themselves. They both testified that they found it unacceptable to cede control to Bobby and Catherine. This is the crux of the parties' dispute. Brian sketched the diagram that showed that Bobby, Catherine, and Jody would control 60% of Epic in exchange for joining the venture. Bobby and Catherine had business relationships, clients, and MSAs authorizing them to work with those clients, all of which Epic desperately needed and could not develop on its own. Jody contributed the idea for Epic's product in the first place and brought Bobby and Catherine to the table.

Appellees testified that, based on the diagram that showed they would each own 20% of the company, in both its limited partnership and general partner-holding company, they worked in furtherance of Epic's venture and to Epic's benefit. They testified that they would not have done any work if they had known that the diagram

was false and that they were not partners in the venture. All along, they believed that a deal had been struck, that they were partners in the venture, and that the execution of a formal partnership agreement was simply a formality. Jason agreed that neither Bobby, Catherine, nor Jody would work for a venture unless they believed that they had some sort of an agreement in place.

Nevertheless, Jason and Brian were operating on a very different set of beliefs about their relationship with Appellees. Although they had represented to Appellees at the March 3 meeting that Appellees would collectively own 60% of Epic, Jason and Brian candidly admitted that they had no intention of either including Jody in the partnership or ceding control of Epic to Bobby, Catherine, and Jody. This was all contrary to the diagram and, according to Appellees' testimony, the parties' discussions at the March 3 meeting.

Jason and Brian also admitted that, though they did not view Appellees as partners in the venture yet (or at all, in Jody's case), from March 3 onward they expected Jody, Bobby, and Catherine to work in furtherance of Epic's venture by developing business, obtaining clients, and providing labor and equipment to complete the all-important field test for their newly redesigned chemical formula.[3]

And Appellees did so. Through their company, Orbit, Bobby and Catherine contacted existing clients with whom they had MSAs in effect and, with some difficulty, secured permission to conduct a field test for Epic's new chemical formula at Diamondback's job site. Leading up to the field test, Jody continued to provide equipment and warehouse and office space on his property, while Epic

---

[3]Although Jody had brought and provided to Jason the original formula that he used from his previous out-of-state business, supply issues and the different geologic conditions of West Texas necessitated a redesign of the chemical formula that was to be used to convert the drill cuttings into road base material. The Railroad Commission's permit had initially been granted for Jody's original formula; therefore, Epic needed to demonstrate the viability of their new formula to potential clients before they could hope to be retained by any of them.

redesigned its chemical formula for the repurposing process. The field test was conducted using Orbit employees and equipment, as well as Jody's labor.

While Appellees were doing all of this, Brian was also busy. First, he filed formation documents to convert Epic into a limited partnership. In this conversion, Brian did not alter the original membership of Epic. That is, the limited partnership's formation reflected the membership of Jason, Brian, Weatherl, and Bruner only. Brian testified that he planned to add Bobby and Catherine later, after a formal partnership agreement had been executed. Brian also filed formation documents for the general partner-holding company, Epic Holdings, LLC. Here, he included only himself and Jason as members of that entity, again, contrary to the diagram that was discussed at the March 3 meeting.

Brian did not send these formation documents, or any information about the formation of these entities, to Appellees for months. In fact, Appellees were unaware that those documents even existed. He did send, on April 5, a proposed agreement for the limited partnership to Bobby and Catherine, in which Jody's ownership percentage was significantly reduced to 11.875%. Jody reassured Bobby and Catherine that he agreed to the reduction; according to Jody, Jason had assured him that he, Jason, would "take care of" Jody out of Jason's ownership percentage.[4] With their concerns dispelled by Jody's explanation, Bobby and Catherine did not protest this change.

---

[4]Brian explained that although, initially, Jody would not be included in the partnership at all, soon after the March 3 meeting, Jason and Jody discussed that Jody would contribute $100,000 to Epic and join as a partner. This was the basis, according to Brian, for Jody's 11.875% in the proposed partnership agreement. When Jody did not make this capital contribution, Brian excluded him from later partnership proposals that were exchanged with Bobby and Catherine. Jody testified that, although he discussed contributing money to Epic, Jason never stated that Jody's membership in the partnership was dependent on any contribution, and Jody believed he was already a partner based on the March 3 meeting.

Bobby and Catherine did not, however, agree to the proposal, nor did they seriously review it through their attorney for several months. Both Bobby and Catherine explained that they believed an agreement was already in place based on the March 3 meeting.[5] In fact, Jason had sent Catherine a text message about three weeks after the meeting in which he stated that Appellees were part owners of Epic, which only confirmed and bolstered their belief. When Bobby and Catherine sent the proposal to their attorney for review, the attorney expressed concern and requested that they also send him the general partnership agreement for him to review. Bobby and Catherine had not received or requested the general partnership agreement before this. Bobby testified that they became concerned about the vagueness and reduction in Jody's share because it could affect their ability to control the company.

Upon receiving the general partnership agreement, Bobby and Catherine, through their attorney, submitted changes that they requested be made to the proposed limited partnership agreement and returned it to Appellants. They also requested that Appellants amend the general partner agreement to include Bobby and Catherine.[6] The most significant edits that they made to the limited partnership agreement was the addition of a supermajority requirement for operational decisions in the company. The consequence of this revision would be to effectively give Bobby and Catherine control, or at least the ability to block any company decision that they did not approve. Bobby and Catherine informed Appellants that they were

---

[5]Bobby and Jody testified that, throughout their careers, they primarily worked according to "handshake" agreements.

[6]In later-exchanged drafts of the proposed general partner agreement, when Appellants added Bobby and Catherine, they also added Weatherl. The effect of this was that Appellants would maintain majority control of the general partner, as Weatherl was unknown to Bobby and Catherine and apparently was another client of Brian's. Brian testified that the membership of the general partner was important information for anyone who wanted to be a limited partner.

prepared to sign the version of the agreement they had sent, which included the supermajority requirement, although it excluded Jody entirely from the partnership.[7] Throughout the negotiations, Bobby and Catherine's paramount concern remained maintaining control of Epic, in light of their mistrust of Jason and Brian's business acumen.

Shortly after Bobby and Catherine sent their proposed revisions to Appellants, Jason informed them by letter that they were not going to be partners in Epic at all. In the letter, Appellants offered Bobby and Catherine a cut of 40% of the net profit that Epic had or would realize. Catherine testified that this offer did not interest them because they did not trust Brian to provide a true accounting of Epic's profits.

After this, Bobby, Catherine, and Jody no longer worked to further Epic's venture. Bobby testified that Orbit's relationship with Diamondback was essentially destroyed when he and Catherine were ousted from Epic, because Epic attempted to invoice Diamondback directly even though it did not have an MSA in effect with Diamondback. Ultimately, Epic did not succeed in obtaining Diamondback as a client. However, because the field test (conducted at Diamondback, a client of Orbit's, and using Orbit's equipment and employees) successfully met the Railroad Commission's criteria for its permit, Epic was able to obtain a different oilfield client. For this client, Epic operated its repurposing process for over a year. Jason and Brian testified that, in 2018 and 2019 combined, after Appellees were no longer involved in Epic, the company collected millions in revenue. Jason claimed, however, that none of this revenue was net profit.

---

[7]Bobby and Catherine's redlined drafts also showed a change that excluded Jody entirely from the partnership. Bobby, Catherine, Brian, and Jason testified that this change, though made by Bobby and Catherine's attorney, was only an update made to align the draft with Appellants' earlier draft agreements that had excluded Jody. Bobby and Catherine did not remove Jody from the partnership of their own accord. Further, Jody had told them that Jason was intending to take care of him through Jason's ownership share.

In short, Jason and Brian achieved what they needed the most from Bobby and Catherine: access to clientele and relationships in the oilfield to oilfield-related companies. In exchange, Bobby, Catherine, and Jody were ousted from Epic, and Bobby and Catherine were left with a damaged relationship with one of their pre-existing clients and no share of Epic's business.

The trial court granted judgment in favor of Appellees on their common-law fraud claim and awarded them benefit-of-the-bargain damages. Appellees presented evidence of the tax return documents for Epic Holdings, LLC in the years 2018 and 2019, which showed distributions to Jason in the amounts of approximately $556,000 and $656,000, respectively. Brian testified that he prepared those tax documents. He also testified that the distributions were actually reimbursements to Jason for expenses on behalf of Epic, and therefore were not profits in which Appellees could share under their theory of liability. But Brian also admitted that, although a reimbursement is not the same as a distribution, the tax returns he prepared reported the funds as being paid to Jason as distributions. Those funds were paid to the holding company by the limited partnership as "management fees." The tax returns did not show any large business expenses. Based on that evidence, the trial court calculated that each of Appellees' benefit-of-the-bargain damages amounted to 20% of the combined distributions made to Jason, or $242,617.80 each.

After the trial court signed its judgment, Appellants requested findings of fact and conclusions of law; they also filed a motion to correct the judgment. In their motion, Appellants contended that the trial court's award of benefit-of-the-bargain damages failed to conform to Appellees' pleadings, in violation of Rule 301 of the Texas Rules of Civil Procedure, because Appellees did not plead or present evidence of benefit-of-the-bargain damages. Appellees filed a response and, after a hearing,

the trial court denied Appellants' motion. The trial court later signed findings of fact and conclusions of law. This appeal followed.

## II. *Standard of Review*

When a party challenges both the legal and factual sufficiency of the evidence, we decide the legal sufficiency issues first and proceed with a factual sufficiency review only if the evidence is found to be legally sufficient. *Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019).

The standard of legal sufficiency is whether the evidence in support of the challenged finding rises to a level that would enable reasonable and fair-minded people to arrive at the verdict under review. *W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 897–98 (Tex. 2020); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We will sustain a challenge to the legal sufficiency of the evidence if (1) evidence of a vital fact is absent, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782–83 (Tex. 2020) (citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004)); *City of Keller*, 168 S.W.3d at 810.

When reviewing a factual sufficiency challenge, we "must consider and weigh all of the evidence," not just the evidence that supports the trial court's finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We must review the evidence in a neutral light. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). If we set aside a judgment on the basis that a vital finding is not supported by factually sufficient evidence, we must detail the evidence that is relevant to the issue and specify how the contrary evidence greatly outweighs the evidence that supports the finding. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

When a party attacks the factual sufficiency of an adverse finding on an issue for which it had the burden of proof at trial, it must demonstrate on appeal "that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem.*, 46 S.W.3d at 242 (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). When a party challenges the factual sufficiency of the evidence supporting a trial court's finding on an issue for which it did not have the burden of proof at trial, we will set aside the finding only if the evidence in support of the finding is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cowan v. Worrell*, 638 S.W.3d 244, 253 (Tex. App.—Eastland 2022, no pet.); *see Pool*, 715 S.W.2d at 635.

III. *Analysis*

A. *Sufficiency of the Evidence: Common-Law Fraud*

In their first issue, Appellants challenge the legal and factual sufficiency of the evidence to support the trial court's finding of common-law fraud. We hold that the evidence is sufficient in both respects.

To prevail on a common-law fraud claim, a plaintiff must prove that "(1) the defendant made a false, material representation; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff justifiably relied on the representation, which caused the plaintiff injury." *Nelson v. McCall Motors, Inc.*, 630 S.W.3d 141, 146–47 (Tex. App.—Eastland 2020, no pet.) (quoting *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019)).

Here, Appellees presented sufficient evidence of the elements that are necessary to establish a claim for common-law fraud. Appellees provided extensive and consistent testimony that Appellants represented to them that they would be

equal partners with majority control of Epic, both at the March 3 meeting and afterwards. Jason texted Bobby and Catherine weeks after the meeting and stated that they were part owners of Epic. Appellees testified that they all believed the diagram and the discussions at the meeting were meant to represent a deal between the parties to work together in furtherance of Epic's business venture. Bobby and Catherine repeatedly testified that majority control was essential to them, and that therefore Jody's inclusion in the partnership was a key reason why they agreed to join the venture.

Appellants testified and conceded that the complained-of representation was false and that they knew it to be false when they made it. Though Appellants contend that the diagram was a mere example, not a representation, they readily admitted that the diagram was impossible to implement as presented. They further testified that ceding control of Epic was unacceptable to them.

Jason testified that he and Brian signed the diagram because they wanted access to clients that Bobby and Catherine could provide. Jason also testified that Appellees would not work for Epic unless they believed an agreement was in place. As soon as Epic obtained a successful field test through the use of Appellees' pre-existing client, their equipment, and their labor, Jason sent a letter to Appellees informing them they were no longer associated with Epic. Here, the evidence supports the trial court's finding that Appellants represented to Appellees that they were partners in Epic as an inducement for them to provide the access and other benefits that Appellees could make available to Appellants.

Finally, Appellees testified at length concerning the work they all did in furtherance of Epic's venture, all of which was precipitated by and based on the false representations that Appellants had made to them. But for Appellants false

representations, Appellees testified that they would not otherwise have performed any work on Epic's behalf.

Appellees' evidence establishes that Appellants made material, false representations to them regarding the partnership and its structure. It further establishes that Appellants intended to induce Appellees to act based on these false representations, and that Appellees did so to their detriment. Although Appellants presented conflicting evidence, the evidence supporting the elements of common-law fraud certainly is enough to reach a level that would enable reasonable and fair-minded people to arrive at the verdict under review. Therefore, we conclude that the evidence is legally sufficient to support the trial court's finding and judgment of common-law fraud.

Similarly, we have considered all of the evidence and conclude that the evidence in support of the trial court's common-law fraud finding is not so weak or so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cowan*, 638 S.W.3d at 253. Appellants' testimony that the diagram was merely an illustration is belied by all of the parties' conduct following the March 3 meeting, as well as by Appellants' own testimony. Further, Appellants admitted that their representation was false and untruthful. Appellants admitted that, although Appellees would not work if they did not believe that they had an agreement in place, Appellants expected Appellees to work for Epic from that point forward. According to Appellants, they signed the diagram because they wanted to use and take advantage of Bobby and Catherine's MSAs and their access to clients.

Although Appellants assert that they did not make any representation to Appellees and that, even if made, any such representation was not intended to induce Appellees to act, Appellants' conduct suggests otherwise. For example, as soon as

Epic obtained a successful field test through the use of Appellees' pre-existing client, their equipment, and their labor, Jason sent a letter to Appellees informing them they were no longer associated with Epic. Epic thereafter quickly obtained another client—something they had been unable to do for years before working with Appellees—and generated significant revenue over the next year or more. Therefore, we conclude that the evidence supporting the trial court's finding of common-law fraud is not so weak or contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cowan*, 638 S.W.3d at 253.

We have carefully and thoroughly reviewed the record consistent with the applicable standards of review and conclude that the evidence is legally and factually sufficient to support the trial court's finding of common-law fraud. Accordingly, we overrule Appellants' first issue.

B. *Benefit-of-the-Bargain Damages*

In their second issue, Appellants assert that the trial court erred when it awarded benefit-of-the-bargain damages to Appellees because Appellees did not plead, request, or present sufficient evidence to support an award for such damages. We disagree.

"Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure." *Zorilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)). "Benefit-of-the-bargain damages are measured by the difference between the value as represented and the value received, allowing the injured party to recover profits that would have been made had the bargain been performed as promised." *Id.* (citing *Formosa Plastics*, 960 S.W.2d at 49–50).

First, Appellants argue that because Appellees did not plead for benefit-of-the-bargain damages, the trial court's award fails to conform to the pleadings, in violation of Rule 301. *See* TEX. R. CIV. P. 301. Second, Appellants argue that the evidence is legally and factually insufficient to support the trial court's damages award.

Appellants cite no authority to support their assertion that, to be available, benefit-of-the-bargain damages must be specially pleaded. "General damages need not be pleaded because they 'are so usually an accompaniment of the kind of breach alleged that the mere allegation of the breach gives sufficient notice' that such damages were sustained." *Archer v. DDK Holdings LLC*, 463 S.W.3d 597, 609 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (quoting *Hess Die Mold, Inc. v. Am. Plasti-Plate Corp.*, 653 S.W.2d 927, 929 (Tex. App.—Tyler 1983, no writ)). Benefit-of-the-bargain damages are direct general damages, rather than special damages, therefore they need not be specially pleaded to be requested and awarded. *See Myers v. Walker*, 61 S.W.3d 722, 730 (Tex. App.—Eastland 2001, pet. denied) (citing *Green v. Allied Ints., Inc.*, 963 S.W.2d 205, 208 (Tex. App.—Austin 1998, pet. denied)); *see also Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex. 1984) (holding that benefit-of-the-bargain damages is a form of general recovery).

Even so, Appellants point out that Appellees expressly stated in a post-submission letter to the trial court that they were "electing to seek out of pocket expenses."[8] Appellants do not raise an argument on appeal that Appellees waived their claim for benefit-of-the-bargain damages; rather, they couch their complaint in

---

[8]After the trial court signed its judgment in which it awarded benefit-of-the bargain damages to Appellees, Appellants filed a motion to correct the judgment and argued that the trial court's judgment did not conform to the pleadings. In their response to Appellants' motion, Appellees explained that, of the two alternative measures of damages available to them—out-of-pocket damages and benefit-of-the-bargain damages—they elected the latter.

18

terms of the requirements of Rule 301. Rule 301 requires that the trial court's judgment must conform to the pleadings and the nature of the case proved, *and* states that the judgment "shall be so framed as to give the part[ies] all the relief to which [they] may be entitled." TEX. R. CIV. P. 301; *see Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006) ("[As the prevailing party, Plaintiff was] entitled to judgment on the most favorable theory supported by the pleadings, evidence, and verdict.") (citing *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002)).

According to Appellees, they were seeking either out-of-pocket expenses or a share of the profits of Epic, that is 20% of the monies distributed to Jason according to Epic's 2018 and 2019 tax returns. Appellees' trial counsel also stated in his closing argument that they were entitled to elect whichever measure of damages— out-of-pocket or benefit-of-the-bargain—that would give them the greatest amount of relief.

Appellees testified that they would each own 20% of Epic, both in the limited partnership and the general partner. Appellees also presented the tax return documents for Epic Holdings, LLC for the years 2018 and 2019, which showed that distributions were made to Jason in the amounts of approximately $556,000 and $656,000, respectively. Brian testified that he prepared those tax documents. He also testified that these distributions were actually reimbursements to Jason for expenses incurred on behalf of Epic, and therefore were not profits in which Appellees could share under their theory of liability. Brian admitted that, although a reimbursement is not the equivalent of a distribution, the tax returns he prepared reported that the funds paid to Jason were distributions, and were his personal, taxable income. Those funds were paid to the holding company by the limited partnership as "management fees."

19

Brian testified that the funds paid to Jason would show as a distribution on the company's tax returns, but that those funds would not necessarily be taxable against Jason if he were to offset the expenses he personally paid for Epic against that income on his personal tax return. In other words, Brian averred that Epic's tax returns are only half of the puzzle, and that Jason's personal tax returns, which were not admitted at trial, are the missing pieces that explain how the approximately $1.2 million he received as income from Epic were not company profits. Regardless, the evidence in the record shows that Jason was paid those funds as taxable personal income from Epic Holdings, LLC, which had charged the same amounts from Epic Energy Services, L.P. in "management fees," and which the limited partnership had paid in full. The evidence supports that these funds were profits from the venture. Conversely, nothing in the record supports that Jason personally paid expenses on behalf of Epic in any amount, or that these funds were paid to him as reimbursements for any such expenses.

Benefit-of-the-bargain damages may include lost profits. *Formosa Plastics*, 960 S.W.2d at 50. Evidence of lost profits must be proved with reasonable certainty by objective data. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001) (citing *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994)). Here, the tax returns alone provide objective data that reasonably determine Epic's profits after Appellees were ousted from the company.

Appellants argue that Appellees' fraud claim alleged only that Appellees owned part of the limited partnership and that the tax returns pertain to the holding company only. Appellants' assertion is incorrect. Appellees each testified, and the diagram illustrates, that they would all own 20% of the venture, with 19.8% in the limited partnership and 0.2% each in the general partner. The later negotiations regarding the proposed general partner agreement do not alter the earlier agreement.

We have reviewed the evidence and conclude that the evidence is both legally and factually sufficient to support the trial court's calculation and award of benefit-of-bargain-damages in favor of Appellees. As such, the trial court did not err when it awarded these damages to Appellees. Accordingly, we overrule Appellants' second issue.

C. *Findings of Fact and Conclusions of Law*

In their third issue, Appellants challenge thirty-one of the trial court's one hundred and eighty-three listed findings of fact as being "inappropriate statements of opinion" or "unsupported by the evidence in the record."[9]

In an appeal from a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict. *Villa v. Villa*, 664 S.W.3d 415, 417 (Tex. App.—Eastland 2023, no pet.) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). Thus, we review the trial court's findings of fact for legal and factual sufficiency by the same standard that we apply when we review jury findings. *AvenueOne Props., Inc. v. KP5 Ltd. P'ship*, 540 S.W.3d 643, 646 (Tex. App.—Amarillo 2018, no pet.) (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996)). Further, we review the trial court's conclusions of law de novo to determine their correctness and we will uphold the conclusions if the trial court's judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

Appellants' challenges here are premised on the same sufficiency challenges discussed above; however, these challenges are directed at certain findings of fact

---

[9]Specifically, Appellants challenge findings of fact numbers 10, 25, 30, 32, 33, 34, 35, 39, 41, 42, 43, 44, 45, 57, 58, 59, 65, 66, 81, 86, 117, 120, 132, 150, 151, 159, 160, 161, 162, 163, and 164.

made by the trial court. We have already explained the legal and factual sufficiency of the same evidence that concerns many of the challenged findings.[10]

Appellants insist that Appellees' testimony at times conflicted, and that these inconsistencies destroyed the trial court's basis for many of its findings. However, we reiterate that in a bench trial the trial court is the factfinder and the sole judge of the credibility of the witnesses and the weight to be afforded their testimony. *See In re Estate of Turner*, 265 S.W.3d 709, 714–15 (Tex. App.—Eastland 2008, no pet.) (citing *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 425 (Tex. App.—Eastland 2006, no pet.)). The trial court may also take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and may accept or reject all or any part of the testimony of any witness. *See id.* (citing *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580–81 (Tex. App.—Houston [1st Dist.] 1997, pet. denied)).

Appellants challenge the trial court's finding numbers 33–35, 57–59, 65, 66, 81, and 120 that concern the trial court's determination that the parties had entered into a binding agreement at the March 3 meeting. The evidence, including Appellants' testimony, shows that Appellants created and signed the diagram that illustrated the parties' agreement for Appellants to gain access to Bobby and Catherine's existing clients and MSAs for Epic's benefit. Appellants and Appellees testified that the diagram showed the allocation of partnership interests for each of them, that they discussed the contributions Appellees would make to Epic in the form of access to their existing clientele, and that, after the meeting, they all expected to work in furtherance of Epic's venture, in accordance with their agreement.

---

[10]For example, Appellants challenge the sufficiency of the evidence to support finding number 30, which states that, at the March 3 meeting, the parties agreed that each of them would own 20% of the company; each would also own 19.8% of the limited partnership and 1/5 of the general partner. Similarly, finding numbers 159–164 all concern the trial court's determination that Appellants committed all the elements of common-law fraud.

Appellants' then-unexpressed intention not to honor this agreement in various respects does not alter the nature of the agreement that they reached on March 3. Thus, we conclude that the evidence is legally and factually sufficient to support these findings.

Appellants challenge the trial court's finding numbers 41–45 that concern the trial court's determination that Appellants did not intend to include Jody in the partnership at all. In fact, Brian testified that, at the March 3 meeting, he did not intend for Jody to be included in the partnership, despite his inclusion in the partnership diagram and their discussions at that meeting. Brian further testified that neither he nor Jason informed Bobby and Catherine of this fact. Bobby and Catherine testified that they considered Jody's inclusion to be essential to the deal and that they would not have agreed to pursue the venture otherwise. Thus, we conclude that the evidence is legally and factually sufficient to support these findings.

As for the challenge to the trial court's finding number 86—that Bobby and Catherine were content to proceed without a formal agreement—Appellants argue that Catherine insisted that the parties sign Bobby and Catherine's revised versions of the agreement, otherwise they would cease working to further the venture. To the contrary, Bobby and Catherine repeatedly testified that they believed they had already entered into a formal agreement on March 3 and that any subsequent agreement submitted by Brian was more of a formality with which they were less concerned. Catherine only made the complained-of assertion after Appellants prepared and sent proposals that differed in terms from the March 3 agreement. As above, the evidence is legally and factually sufficient to support this finding.

Appellants mischaracterize their challenge to trial court finding number 117. This finding recites that "Epic" generated revenue of $2.1 million in 2018 and

$1,692,000 in 2019. However, Appellants' complaint avers that there is insufficient evidence that "Epic Energy Service[s] LP" had such revenue. Appellants challenge finding number 132, which states that the distributions to Jason were income, and not the repayment of expenses. This finding is supported by the aforementioned tax returns, which listed the funds that were paid to Jason as distributions, not reimbursements. Finally, Appellants' challenge to finding numbers 150–151—that Brian and Jason were not credible witnesses—is without merit because all credibility determinations rested with the trial court, as the sole finder of fact.

We have thoroughly reviewed the record and have evaluated the evidence in accordance with the applicable standards of review, as we must, and conclude that the evidence is legally and factually sufficient to support each of the trial court's challenged findings of fact. Accordingly, we overrule Appellants' third issue.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.



W. STACY TROTTER

JUSTICE


July 20, 2023

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.